[No. 38025.   Department Two.   June 16, 1966.]

*In the Matter of the Estate of* NIKKI JO MOORE, *Deceased.*
ALFRED LEROY MOORE, *Appellant,* v. HOBART S. DAWSON,
*as Administrator, et al., Respondents.**

*Marshall Forrest,* for appellant.

*Sam Peach,* for respondent Dawson.

*T. B. Asmundson,* for respondent heirs.

*Reported in 415 P.2d 653.

HAMILTON, J.—Nikki Jo Moore, an enrolled member of the Klamath Indian Tribe, was born out of wedlock in Bellingham, Whatcom County, Washington, on May 23, 1953. She died from an accidental gunshot wound in Chiloquin, Klamath County, Oregon, on September 1, 1962, and left a considerable estate. Her mother predeceased her, having passed away in Bellingham on February 15, 1962. Surviving Nikki are 15 brothers and sisters. Appellant, Alfred Leroy Moore, asserts he is her father and sole heir.

Nikki's estate consists of a substantial sum held in trust by the Bellingham National Bank. Probate was commenced in Klamath County, Oregon, and in Whatcom County, Washington.[1] In due course, the administrator in the Washington probate proceeding filed a final report and petition for distribution asking that the estate be distributed, under Washington law,[2] to her brothers and sisters. Claiming paternity and contending that Nikki was domiciled in Oregon at the time of her death, appellant challenged the proposed distribution upon the ground that under applicable Oregon law[3] her estate descended to him. After hearing, the trial court concluded that appellant had failed to establish paternity, that Nikki was domiciled in Washington at the time of her death, and that her estate passed to her brothers and sisters. Alfred Leroy Moore appeals. We affirm the trial court.

The background facts may be summarized as follows: Nikki's mother, Teresa Charles Jefferson, a member of the Klamath Indian Tribe, married a man whose last name was Charles, sometime in the late 1930's or early 1940's. Of this marriage several children were born and survive. Sometime in the mid-1940's Charles suffered a criminal conviction and, following his incarceration, Alfred Leroy Moore, a

---

[1] State court jurisdiction over her estate comes by virtue of the Klamath Termination Act § 9b, 68 Stat. 720, 25 U.S.C.A. § 564h(b) (1954).

[2] If any illegitimate child shall die intestate without lawful issue, his estate shall descend to his mother, or in case of her decease, to her heirs at law." RCW 11.04.090.

[3] ORS § 111.020, so far as pertinent, provides that if a decedent leaves no issue and no mother, the estate shall go to the father.

member of the Klamath Indian Tribe and a veteran with a service connected disability and pension, moved into the residence owned and occupied by Nikki's mother in Chiloquin, Oregon. Subsequently, Nikki's mother obtained a divorce from Charles, but no formal marriage developed with Alfred Leroy Moore. During the course of this cohabitation in Chiloquin, Oregon, four presently surviving children were born, each of whom was enrolled by Nikki's mother as a member of the Klamath Indian Tribe with Alfred Leroy Moore being named on the enrollment register as the father. Mr. Moore did not participate in the enrollment procedure nor in his designation as the children's father. He did not, however, deny paternity.

In the latter part of 1952 or the early part of 1953, Nikki's mother terminated the arrangement with Mr. Moore. She, with the Charles and Moore children, moved to Bellingham. Mr. Moore continued to reside in Chiloquin, living with his parents and following the rodeo circuit. On May 23, 1953, Nikki was born. Following the earlier practice, Nikki's mother enrolled her as a member of the Klamath Indian Tribe, and designated Mr. Moore as the father. Again, Mr. Moore neither participated in nor protested the enrollment. Neither did he contribute anything to the support of Nikki's mother or the children, nor otherwise affirmatively acknowledge, accept, or recognize any responsibility or obligation toward them.

In Bellingham, Nikki's mother met and married Gabriel Jefferson. Together they established a home wherein they, the Charles, the Moore, and the five children born of the Jefferson marriage, resided until Mrs. Jefferson's death in childbirth on February 15, 1962.

In July, 1958, pursuant to the provisions of the Klamath Termination Act; ch. 732, 68 Stat. 718 (1954), as amended, 25 U.S.C.A. § 564-564w (1954), trust accounts, in lieu of tribal property were established by the Department of the Interior, Bureau of Indian Affairs for the Moore children and those of the Charles children who were enrolled in the Klamath Indian Tribe. By written contract, the Bellingham National Bank was designated by the Secretary of the In-

terior as trustee of the respective accounts. The initial *res* of Nikki's account was approximately $43,000, which has subsequently increased through investments. In passing, it should be observed that Mr. Moore, as a member of the Klamath Indian Tribe, also participated in the distribution of tribal assets under the Termination Act. He, too, received approximately $43,000 which, so far as the record reveals, he devoted to his own uses without regard to the welfare or support of any of the children designated as the Moore children.

Following the death of Nikki's mother, the Moore children remained with Gabriel Jefferson and his sister in Bellingham. Support was provided through drawings from the respective trust accounts. Caring for such a large number of children, however, proved too much of a burden for the Jeffersons. Consequently, the Bellingham National Bank, as trustee, undertook to locate suitable homes. In the process, the trustee came in contact with a sister of the deceased mother who resided in Klamath, Oregon. She, in turn, enlisted the interest of Mr. Moore's parents and two sisters. Through the combined efforts of the trustee, Mrs. Jefferson's sister, and Mr. Moore's relatives arrangements were made for placement of the children in the homes of Mr. Moore's sisters in Oregon. Support was to continue for the children from drawings on their trust accounts. Permanency of the placement was not discussed, nor were any guardianship proceedings initiated either in Washington or Oregon. At the end of the school year in Bellingham, June 1, 1962, Mr. Moore's sister and mother transported the children to Oregon. Nikki was placed in the home of Mr. Moore's sister who resided in Chiloquin across the street from the elder Moores. So far as the record reveals, Mr. Moore demonstrated no particular concern for the welfare of the children following the death of their mother. Neither did he assist in arranging their placement, as he was otherwise engaged with his rodeo pursuits. Nikki remained with Mr. Moore's sister throughout the summer of 1962 and until her tragic death on September 1, 1962.

The trial court in directing distribution of Nikki's estate to her brothers and sisters, predicated its order upon the determination that Nikki was an illegitimate child and that her domicile, acquired through her mother and by birth, remained in Washington throughout her sojourn in Oregon. This determination pivoted, in part at least, upon the tacitly conceded fact that Mr. Moore had never, prior to Nikki's death, legitimated Nikki or otherwise established paternity under the laws of Oregon, the state of his residence. From these conclusions, the trial court reasoned that RCW 11.04-.090, *supra* footnote 2, applied, and that Nikki's brothers and sisters, as heirs of Nikki's mother, were entitled to her estate to the exclusion of any claim of Mr. Moore.

Mr. Moore, on the other hand, makes no claim of heirship under the Washington laws of descent and distribution. He essentially limits his challenge to the trial court's order of distribution to the contention that Nikki's domicile, at the time of her death, was in Oregon by virtue of her move there in June 1962, and his assertion of paternity.

The term "domicile" connotes a place with which a person has a connection for certain legal purposes, *e.g.*, jurisdiction, determination of legitimacy, descent of personal property. The terms "residence" and "home" are not necessarily synonymous. *In re Mullins*, 26 Wn.2d 419, 444, 174 P.2d 790 (1946); Restatement, Conflict of Laws § 9 (1934); 25 Am. Jur. 2d *Domicil* § 1 (1966). All persons, including infants, have a domicile somewhere, and such domicile, once established, continues until another is legally acquired. Restatement, Conflict of Laws §§ 11, 23 (1934); 25 Am. Jur. 2d *Domicil* §§ 2, 16 (1966).

An unemancipated child cannot unilaterally acquire, change, or determine its domicile. The domicile of such a child is assigned by operation of law. If the infant is legitimate, its domicile ordinarily follows that of the father. If, however, the infant is illegitimate, it takes the domicile of its mother, unless and until the putative father legitimatizes the child in which event the child's domicile ordinarly becomes that of the father. However the domicile of the unemancipated infant is acquired, it continues during minority

to attach to the domiciliary parent until otherwise changed by law. Restatement, Conflict of Laws §§ 14, 23, 26, 30, 34 (1934); 25 Am. Jur. 2d *Domicil* §§ 63, 69, 70 (1966).

■ Upon the death of the mother of an illegitimate child, and absent intervening adoption, the putative father, if fit and the welfare of the child permits, is entitled to custody and control over the child as against all others. *Wade v. State,* 39 Wn.2d 744, 238 P.2d 914 (1951). See Annot., 37 A.L.R.2d 882 (1954). Logically, however, the putative father must affirmatively assert and exercise his right to custody and control during the lifetime of the child, if it is to be recognized and have any effect upon the domicile of the child. Otherwise, the child retains the domicile acquired through the mother until other events produce a lawful change.

■ If the putative father of an illegitimate child, whose mother has died or abandoned the child, fails to assert and exercise his right to custody, then, in the absence of guardianship or other appropriate judicial proceedings, relatives of the child, preferably grandparents, who take the child into their home and actually stand in loco parentis to the child may be considered as natural guardians and effect a change of domicile. *Cf.* Restatement, Conflict of Laws § 39 (1934); 25 Am. Jur. 2d *Domicil* § 72 (1966); 1 Beale, Conflict of Laws § 39.1 (1935); Annot., 32 A.L.R.2d 863 (1953).

In the instant case, it is undisputed that Nikki was born out of wedlock in Bellingham, Washington. Likewise, it is uncontradicted that her mother established and maintained her domicile in Bellingham. Nikki was, therefore, at birth an illegitimate child and took Bellingham, the domicile of her mother, as her domicile. This domicile continued, then, until otherwise legally superseded.

Mr. Moore contends, however, that upon the death of Nikki's mother and by virtue of her removal to Oregon, his domicile, as putative father, became her domicile by operation of law. Thus, he asserts, her Bellingham domicile was superseded. We cannot agree. The evidence does not reveal that Mr. Moore took any steps whatsoever during Nikki's

lifetime to legitimatize her under either Oregon, Washington, or general law. He did not follow any of the steps for establishing paternity outlined in ORS 109.070[4] or RCW 11.04.080, and 26.04.060.[5] He did not affirmatively acknowledge her as his child, recognize any financial or filial obligations toward her, seek her custody, offer her a home, or otherwise manifest any significant parental concern about her welfare, either before or immediately following her mother's death. In short, he did nothing before her death to exercise his right to her custody and control. His belated attempt now, after Nikki's death, to assume the parental role for inheritance purposes comes too late to work a retrospective change of domicile by operation of law.

Mr. Moore next asserts that, standing alone, Nikki's placement in the Oregon home of his sister, in close proximity to his parents and her maternal aunt, worked a change of domicile. Again we must disagree.

The evidence does not satisfactorily indicate that any discussion relative to Nikki's placement, following the death of her mother, was initiated by Mr. Moore or his relatives. Understandably, perhaps, there was no spontaneous or unconstrained surge on their part to assume responsibility.

---

[4]"The paternity of a person may be established as follows:

"(1) The child of a wife cohabiting with her husband who is not impotent, shall be conclusively presumed to be the child of her husband, whether or not the marriage of the husband and wife may be void.

"(2) A child born in wedlock, there being no decree of separation from bed or board, shall be presumed to be the child of the mother's husband, whether or not the marriage of the husband and wife may be void. This shall be a disputable presumption.

"(3) By the marriage of the parents of a child after his birth.

"(4) By filiation proceedings as provided in ORS 109.110 to 109.230.

"(5) By paternity being established or declared by other provision of law." ORS 109.070.

[5]"Every illegitimate child shall be considered as an heir to the person who shall in writing, signed in the presence of a competent witness, have acknowledged himself to be the father of such child, and shall in all cases be considered as heir of his mother, and shall inherit his or her estate in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock; . . . ." RCW 11.04.080.

". . . . Illegitimate children become legitimate by the subsequent marriage of their parents with each other." RCW 26.04.060.

Instead, it would appear that all were content to accept the status quo, so long as Mr. Jefferson was willing and able to provide a home, custody, and supervision. And, when discussions were initiated, there was consideration given to the prospect that some one of the older half sisters might then or in the future accept custody of some of the Moore children, thus leaving the permanency of the arrangement ultimately reached somewhat indefinite. The stepfather, Mr. Jefferson, and the half brothers and sisters, in the most part, remained in Washington thereby furnishing a home base of sorts in Bellingham, should problems develop. No guardianship proceedings over any of the Moore children were initiated or seemingly contemplated. The cost of Nikki's care, support, and education was not assumed by Mr. Moore's relatives, but was to be paid from her trust account, the amount and extent of which, according to the trust agreement, was to depend upon the discretion of the Bellingham National Bank. The corpus of the trust estate, too, remained in Washington, and, under the trust contract, the assets were to be turned over to Nikki's personal representative in Washington in the event of her death. Under these circumstances, it can hardly be said that Mr. Moore's relatives actually stood in loco parentis to Nikki. She did not, then, through their actions acquire a new domicile for purposes of this proceeding.

The trial court properly determined that the "domicile of succession" remained in Washington.

The judgment is affirmed.

ROSELLINI, C. J., DONWORTH and FINLEY, JJ., and LANGSDORF, J. Pro Tem., concur.