635 P.2d 187

**In the Matter of the APPEAL IN PIMA COUNTY JUVENILE ACTION NO. S–903.**

**No. 2 CA–CIV 4083.**

Court of Appeals of Arizona, Division 2.

Sept. 14, 1981.

Review Denied Oct. 14, 1981.

Southern Arizona Legal Aid, Inc. by Joyce Edline Holsey, Tucson, for appellant.

Ann M. Haralambie, Tucson, for appellee.

## OPINION

HOWARD, Judge.

Appellant, natural mother of an Indian child, brings this appeal from a juvenile court order severing her parental rights. This case is governed by the federal Indian Child Welfare Act of 1978 and is one of first impression in this state. We agree with appellant that reversal is required.

Congressional investigation of child custody proceedings involving Indian children culminated in passage of the Act. In the Act, Congress declared a two-fold national policy: the protection of the best interests of Indian children, and the promotion of stable and secure Indian tribal entities. 25 U.S.C.A. § 1902. To prevent the separation of Indian children from family and tribal heritage, the Act established minimum federal standards applicable to child custody proceedings.

Hearings conducted in 1974 before the Senate Committee on Indian Affairs revealed a pattern of discrimination against American Indians in child welfare and child custody. Testimony indicated that for decades officials had removed a disproportionately large number of Indian children from their homes and reservations, and had placed them in non-Indian homes and that many of the removals were unwarranted because officials showed too little deference to Indian cultural norms and denied due process in child custody proceedings. These practices deprived many children of their tribal and cultural heritage.

To reverse this erosion of Indian family life, Congress enacted the Act. See H.R. Rep.No. 1386, 95th Cong., 2d Sess. 8, reprinted in [1978] U.S.Code Cong. & Ad. News 7530.

The concept that Indian tribes are independent communities possessing their own natural rights permeates the Act. In its allocation of jurisdiction in custody proceedings the Act defers to the inherent sovereignty of the tribe over matters affecting this internal welfare. 25 U.S.C.A. § 1911(a). More significantly, it provides mechanisms whereby the tribe can exert its jurisdiction or influence beyond reservation boundaries in child custody actions involving off-reservation tribal members. 25 U.S.C.A. § 1911(b). This latter section modifies the general rule that Indians off the reservation are subject to state jurisdiction by requiring state courts to transfer to the tribe most child custody proceedings upon petition by the Indian child's parent, Indian custodian, or tribe. Only if a parent objects, or the tribal court declines, or there is

"good cause" not to transfer the proceeding, may this referral jurisdiction be prevented. In addition, 25 U.S.C.A. § 1911(c) allows representation of tribal interests, even when the state court retains jurisdiction, by affording the parent, Indian custodian or child's tribe the right to intervene in the state court proceeding.

The Act is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected.[1] By its enactment, Congress legislatively created a new jurisdictional framework in Indian child welfare, replacing the outmoded geographical concepts of presence or domicile with a jurisdictional standard based on the ethnic origin of the child. This standard avoids the problems of forum shopping and gives real authority to tribal courts to adjudicate child custody issues. The Act reflects Congressional recognition of the importance of child rearing to the tribe.

The Act defines certain procedures to be followed in state court proceedings involving Indian children. These procedures protect the Indian parent or custodian from a moving party's abuse of either voluntary or involuntary placement procedures. Even if the state court retains jurisdiction, the tribe is protected against the possibility of state court bias against tribal culture as it may intervene at any point in the custody proceeding 25 U.S.C.A. § 1911(c), and the parent-child relationship can be terminated only by a showing of parental unfitness beyond a reasonable doubt. 25 U.S.C.A. § 1912(f). Additionally, the party seeking to effect termination of parental rights is required to satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. 25 U.S.C.A. § 1912(d). The effectiveness of the changed jurisdictional structure is insured by inclusion in the Act of a full faith and credit provision. 25

U.S.C.A. § 1911(d). We shall discuss these and other provisions of the Act in addressing the merits of this case.

The facts disclosed by the record are as follows. Appellant is a member of the Assiniboine Tribe in Montana and was fifteen years old when her child was born on February 27, 1980, in Henderson, Nevada. On March 18, 1980, she executed a voluntary relinquishment of her parental rights which was subsequently accepted by the Nevada District Court. The document recited that the minor child was relinquished to the Nevada Catholic Welfare Bureau, Inc. for the purpose of adoption and the bureau was authorized to consent to the child's adoption. One paragraph of the document recited:

"That Affiant has been advised and understands that this relinquishment may be withdrawn anytime prior to the entry of a final decree of adoption. This may be done by executing, under oath, a document stating her intention to revoke this relinquishment in the same court that the relinquishment was signed."

On September 29, 1980, appellant requested the return of her child and the appropriate document was filed on October 2 in the Nevada court. By letter dated October 8, 1980, the Nevada Catholic Welfare Bureau was advised by the Nevada court clerk of the revocation of relinquishment and that arrangements should be made promptly for the return of the child to appellant. In the interim, however, the Nevada agency had made arrangements with appellee, Catholic Social Service of Tucson, to place the child with an adoptive family and in fact the baby was picked up in Nevada on May 24 and taken to Tucson. The Nevada agency was unable to return the child to appellant as the Arizona agency informed Nevada "that the parents were unwilling to give up the child, and they wanted to take it to Court."

On October 27, 1980, a petition for termination of parental rights was filed in Arizo-

---

1. Indian Child Welfare Act of 1978: Provisions and Policy, 25 S.D.L.Rev. 98 et seq. (1980) per author's telephone interviews in 1979 with Bertram Hirsch, Association on American Indian Affairs, who helped draft the Act.

na alleging that the natural mother had abandoned the child. The same day a temporary custody order was entered directing that temporary custody of the child remain with his prospective adoptive parents under the supervision of the petitioner, Catholic Social Service of Tucson. Appellant was served on October 31 in Montana and the tribal council was served on November 3. A letter from the attorney for the Nevada Catholic Welfare Bureau, with an enclosed certified copy of appellant's revocation of voluntary relinquishment, was filed on November 18, 1980.

By letter dated November 7, 1980, appellant and her mother requested the tribal chairman in Montana to intervene in this Arizona custody proceeding. The record reflects that on January 20, 1981, a letter was written to the presiding judge of Pima County Superior Court by the vice-chairman of the Assiniboine and Gros Ventre tribes of the Fort Belknap Indian Community Tribal Government of the Fort Belknap Indian Reservation, Montana. The writer advised the court that the tribal government wished to intervene in this custody matter and have jurisdiction transferred to the tribal court in Montana. The letter concluded by stating: "Please advise me if there are any additional documents which needs to be filed prior to the date of hearing on this matter."

On March 11, 1981, appellant filed a petition to transfer this case to the tribal court in Montana. The petition alleged that the tribal court had exclusive jurisdiction under the Indian Child Welfare Act, that appellant did not object to transfer, and that the tribal court was willing to accept jurisdiction. Appellee's opposition, filed April 7, asserted that "good cause" existed for retention of state court jurisdiction in that (1) Montana, the proposed tribal forum, would have no evidence concerning the best interests of the child as he had never lived in Montana and (2) separation from his adoptive parents would cause a substantial risk of serious emotional harm to him.

By April 10 minute entry, a hearing on the severance petition and the petition to transfer was ordered to be held on May 8, 1981. On May 6, appellant filed a reply to the opposition to her petition for transfer. Appended were copies of various documents supporting her position that state court jurisdiction was improper.

At the commencement of the May 8 hearing, the court took under advisement the petition to transfer and proceeded to hear evidence on the severance petition. At the conclusion of the hearing, the petition to transfer was denied and severance of appellant's parental rights was ordered. The court made the following findings of fact: That appellant and her tribe had been notified of the hearing, that the minor child was domiciled in Arizona inasmuch as his mother had relinquished her parental rights on March 18, 1980, and the child has resided continuously in Arizona since May 24, 1980; that the mother had had no contact with the child for more than six months and had abandoned the child, that the mother had filed a revocation of her relinquishment in Nevada on October 2, 1980, and that the tribe had filed notice of intervention but had not otherwise participated in this matter; that the child was eligible for membership into the Assiniboine tribe; and that the best interests of the child were that he remain with his prospective adoptive parents. The court concluded that it had jurisdiction because Catholic Social Service and the child resided in and were domiciled in Pima County, that good cause existed not to transfer the matter to tribal court for hearing, that the mother had abandoned the child within the meaning of A.R.S. § 8-533(1), that removal of the child from his preadoptive home and his return to the mother would result in serious emotional or physical damage to him, and that the petitioner for severance had met its burden of proof beyond a reasonable doubt.

A formal motion to intervene by the Fort Belknap Indian community and to transfer the proceedings to tribal court was filed on May 11, 1981, indicating that inasmuch as appellant had withdrawn her consent to adoption, it was appropriate that, pursuant to the spirit and letter of the Indian Child

Welfare Act, the proceedings be transferred to the tribal court in Montana for investigation and determination of placement of the child.

We agree with appellant that the severance order must be vacated and custody of the child returned to her for three reasons. First, the Arizona court lacked jurisdiction of this proceeding; second, assuming arguendo the state court had concurrent jurisdiction, it should have declined to exercise it; and third, assuming arguendo retention of jurisdiction was appropriate, the requisite burden of proving grounds for termination of parental rights was not met. We shall discuss each of these reasons.

### EXCLUSIVE JURISDICTION

■ 25 U.S.C.A. § 1911(a) provides in pertinent part:

"An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law."

It is not disputed that this was a child custody proceeding and that appellant's child is an Indian child within the purview of the Act. Appellant, an unemancipated minor, was domiciled within the Fort Belknap reservation in Montana as that was the domicile of her father. *Garay Uppen v. Superior Court of Pima County*, 116 Ariz. 81, 567 P.2d 1210 (App.1977). Her illegitimate child, however, took the domicile of its mother. *In Re Estate of Moore*, 68 Wash.2d 792, 415 P.2d 653 (1966); *In re Guardianship of Sharp*, 41 Cal.App.2d 79, 106 P.2d 244 (1940); 25 Am.Jur.2d Domicil § 69. The domicile of an infant born out of wedlock remains that of its mother until a new one is lawfully acquired. *Application of Morse*, 7 Utah 2d 312, 324 P.2d 773 (1958); *In re Guardianship of Sharp*, supra. Although the child was living in Arizona with the prospective adoptive parents pursuant to a temporary custody order, its domicile had not yet been legally changed and therefore it was a domiciliary of the

reservation in Montana. The only change in the status of appellant's child was his removal to this state by reason of appellant's relinquishment of him for the purpose of adoption.

### CONCURRENT JURISDICTION

■ 25 U.S.C.A. § 1911(b) provides:

"In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian of the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe." (Emphasis in original)

This provision was intended to permit a state court to apply a modified doctrine of *forum non conveniens*. H.R.Rep.No. 1386, supra, at 21. The juvenile court found good cause for exercise of jurisdiction in this state. The term "good cause to the contrary" is not defined in the statute but a definition is found in 44 Fed.Reg. 24000, 24001, RG(i) (1979) as including but not limited to the facts that (1) the child's biological parents are unavailable; (2) no Indian custodian has been appointed; (3) the child has had little contact with the tribe for a significant period of time; (4) the child has not resided on the reservation for a significant period of time; and (5) the child, over 12 years of age, has indicated opposition to the transfer. One law review article suggests that "good cause to the contrary" could include the absence of a tribal mechanism for handling child custody proceedings. See The Indian Child Welfare Act—Tribal Self-Determination Through Participation in Child Custody Proceedings, Wis.L.Rev.1979: 1202, 1213, f. n. 69. Another law review article points out that accessibility to proof would seem to be the principal factor on which state courts could rely to retain jurisdiction. Indian Child

Welfare: A Jurisdictional Approach, 21 Ariz.L.Rev. 1123, 1143 (1979). The author points out: (1) If the tribe desires that the case be heard by the tribal court, distance from the reservation in and of itself would not be sufficient "good cause" for the state court to refuse to transfer the proceedings despite the expense, and (2) in most instances an Indian parent will call witnesses residing on the reservation to rebut evidence as to parental unfitness and the state court must make a determination as to which party is most able to bear the expense of producing witnesses in distant courts. The only justification for retention of jurisdiction in Arizona is the presence of the child and the prospective adoptive parents. However, the issue in these termination proceedings is not the fitness of the adoptive parents but rather the unfitness of the parent whose relationship is sought to be severed.

The very posture of this case from start to finish militates against retention of jurisdiction here. 25 U.S.C.A. § 1913(c) provides:

"In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child *shall be returned* to the parent." (Emphasis added)

As noted above, appellant withdrew her relinquishment on October 2, 1980. Her revocation was timely and properly filed in the Nevada court. This information was conveyed to the prospective adoptive parents. An adoption worker who testified at the severance hearing expressed her concurrence with the adoptive parents in trying to keep the child:

"I feel that the child's security in the home would be in jeopardy if the child were moved.

I felt also frankly that the law is unfair, it does not specifically acknowledge the best interests of the child. And I had serious reservations as to what was now

prompting this young woman to change her decision.

And the fact that there was no follow-up as to see what her needs were at the moment, and whether her need was for the child, or she had another need that she was calling out for help on."

On cross-examination, she indicated her awareness that Congress felt that the Act was in the best interest of the sovereignty of the tribes but, in her opinion, the Act does not address the child's needs.

■■ It is apparent from the very wording of 25 U.S.C.A. § 1913(c) that Congress was not concerned with the reason a parent might have for withdrawal of consent. The Act unquestionably provides a higher standard of protection to the rights of parents in termination proceedings. *E. A. v. State*, 623 P.2d 1210 (Alas.1981). When an Indian child within the purview of the Act is involved, adoption agencies and prospective adoptive parents must be held to assume the risk that a parent such as appellant might change her mind before the adoption is finalized.

■ We believe the lower court should have deferred to tribal jurisdiction. Evidence concerning the mother's fitness as a parent would be more readily accessible in Montana. Qualified expert witnesses as to whether custody in the mother would likely result in serious emotional or physical damage to the child would also be more accessible as expert witnesses lacking knowledge of the tribal culture and values may not be "qualified" to give an opinion.

BURDEN OF PROOF

Finally, even assuming that the Arizona court had jurisdiction and properly declined to refer the proceeding to tribal court, the only ground for termination of parental rights was not proven.

25 U.S.C.A. § 1912(f) provides:

"No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert wit-

nesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

Section 1912(d) provides:

"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

Since appellant had revoked her voluntary relinquishment, these provisions controlled.

■ There is no evidence as to appellant's fitness as a parent or any attempt to preserve the parent-child relationship. In fact, the contrary appears. Appellant was entitled to the return of her child, then only seven months old, when she revoked her relinquishment. Any potential emotional trauma to the child if the contemplated adoption is aborted was engendered by the conduct of the adoptive parents not adhering to the mandates of the Act. The evil which Congress sought to remedy by the Act was exacerbated by the conduct here under the guise of "the best interests of the child."

■ Appellee's argument that Indian children are being denied equal protection of the law because of denial of access to state court has no validity. The denial of access to state court is based solely upon the political status of the parent and child and the quasi-sovereign nature of the tribe. This is a discriminatory classification which is not prohibited by the United States Constitution. *Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Matter of Guardianship of D. L. L. & C. L. L.*, 291 N.W.2d 278 (S.D.1980).

The order severing appellant's parental rights is set aside. The cause is remanded with directions to enter an appropriate order granting the petition to transfer and directing appellee to forthwith return appellant's child to her.

HATHAWAY, C. J., and BIRDSALL, J., concur.