NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

THE NAVAJO NATION,
*Appellant*,

v.

DEPARTMENT OF CHILD SAFETY, B.P.,
*Appellees*.

No. 1 CA-JV 21-0225
FILED 2-10-2022

---

Appeal from the Superior Court in Maricopa County
No. JD35914
The Honorable Julie Ann Mata, Judge

**JURISDICTION ACCEPTED; RELIEF DENIED**

---

COUNSEL

Rothstein Donatelli, LLP, Tempe, AZ & Albuquerque, NM
By April Olson, Glennas'ba B. Augborne Arents, Alicia Consuelo Lopez,
Wouter Zwart
*Counsel for Appellant*

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellee B.P.*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Acting Presiding Judge David D. Weinzweig delivered the decision of the Court, in which Judge Paul J. McMurdie and Chief Judge Kent E. Cattani joined.

---

**W E I N Z W E I G**, Judge:

¶1    This case concerns the placement preferences set forth in the Indian Child Welfare Act of 1978 ("ICWA"). The Navajo Nation ("Nation") appeals the denial of its motion to change physical custody of an Indian child in foster care, arguing the superior court improperly found good cause to depart from ICWA's preferences. For the reasons that follow, we accept jurisdiction but deny the requested relief.

### FACTS AND PROCEDURAL BACKGROUND

¶2    Nelturiah Segay ("Mother") is the biological parent of B.P., born in September 2014. In late-May 2018, Mother was arrested and charged with domestic violence for punching her boyfriend several times in the face. B.P. observed the incident. Because there was no alternative caretaker present for B.P., the police called the Department of Child Safety.

¶3    B.P. was removed from the home and placed in a licensed, non-Indian foster home. His foster parents were Kristin and Steven. DCS petitioned for dependency on June 1. A DCS representative called the Nation and left a voicemail on June 4 because Mother said she was a member. DCS formally notified the Nation about the dependency proceedings by certified letter on July 5.

¶4    A Guardian Ad Litem ("GAL") was appointed in early June. After a hearing on September 11, the court found B.P. dependent as to Mother. A representative of the Nation called into the hearing. With a case plan of family reunification, the Nation preferred that B.P. be placed in the Phoenix area. But neither the Nation nor Mother identified any ICWA placements for B.P. The court therefore found good cause to depart from ICWA placement preferences and approved B.P.'s placement in the non-Indian foster home of Kristin and Steven.

**¶5** The Nation then assigned a senior social worker, Celeste Smith, to the case. Ms. Smith actively tried but could not find an ICWA placement for B.P. DCS had likewise "looked for an ICWA-compliant placement," but was "never able to find one." All the while, B.P. continued to live in the same foster home with the same foster parents.

**¶6** According to several reports from the Court-Appointed Special Advocate between January 2019 and September 2020, B.P. had formed a "deep attachment" with his "kind, patient and loving" foster parents. The CASA Advocate also reported that B.P.'s foster parents were trying to nurture his Navajo roots by visiting the Navajo reservation, reading books about Navajo culture, and learning the Navajo language.

*Severance and ICWA Placement in Ohio*

**¶7** In the meantime, family reunification efforts failed, and DCS orally moved to change the case plan to severance and adoption in July 2019. A pretrial conference was held on February 11, 2020, and the court heard from the Nation's Celeste Smith, who "emphasized that at this time there is good cause to deviate from the placement preferences of the Indian Child Welfare Act" because Mother "still maintains her parent-child relationship, there are no Navajo Nation foster homes available, and the only homes available would be adoptive homes."

**¶8** About two weeks later, the Nation recommended an ICWA, pre-adoption placement to DCS for the first time. The ICWA placement was located in Ohio, but the family traveled regularly to Arizona. And though not immediate blood relatives, B.P. belonged to the same clan as the Ohio family. The Nation asked DCS to facilitate visits between B.P. and the Ohio family. Because the placement was out-of-state, however, DCS was required to conduct a professional evaluation under the Interstate Compact for the Placement of Children ("ICPC"). *See* A.R.S. § 8-548. By this time, B.P. had lived in the same foster home with foster parents Kristin and Steven for more than 630 days.

*The Severance Trial*

**¶9** The severance trial was held less than four months later, on June 17. Just weeks before the trial, the Nation intervened in B.P.'s dependency action, contesting the child's non-ICWA placement but not the severance.

**¶10** The court terminated Mother's parental rights and found good cause for B.P. to remain in his placement. As relevant here, the court

found that B.P. is "very bonded" with his "current placement," and "there are no Navajo Nation foster homes available, and the only homes available would be adoptive homes." The court observed that Mother "still maintains her parent-child relationship" and "she does not want the child moved from his current placement based on that bond." And the court cited to the "testimony of the [Nation's own] qualified expert witness [Ms. Smith,] emphasiz[ing] that at this time there is good cause to deviate from the placement preferences of the Indian Child Welfare Act."

¶11 On September 1, the CASA Advocate voiced concern about B.P.'s mental health if relocated from his foster parents to the Ohio placement:

> CASA appreciates the interest of the Navajo Nation in its children and its desire to continue the heritage and culture of the Nation through [its] children. However, it has been over two years since [B.P.] came into the care of DCS and his foster parents. To remove [B.P.] from the only family he has known since he came into care and to move him to a Navajo military family currently residing in Ohio who will immediately adopt him without fostering first, inflicts unacceptable trauma to this child.

> While this may be what the Nation considers to be in the best interest of the child, CASA believes there are less traumatic ways in which [B.P.] can retain his Navajo heritage and grow up to be a confident young man. [A]t the end of the day, [B.P.] is all that matters.

*The Nation Moves to Change Physical Custody*

¶12 Two days later, on September 3, the Nation moved the court to change physical custody of the child from the Arizona foster home to the Ohio family under ICWA and Arizona's placement preferences.

¶13 The motion was premature, however, because Ohio's ICPC office only approved the placement in October, about five weeks after DCS sent the ICPC referral. DCS objected on that ground. B.P.'s GAL also objected, arguing that good cause existed to deviate from ICWA's placement preferences, and emphasizing that B.P. would suffer trauma if uprooted from his Arizona foster home and moved to Ohio. The GAL pointed to the child's night terrors, that he had never met the Ohio placement and had formed a strong bond to his foster parents, and that Mother wanted B.P. to remain with his current placement. The Foster Care

4

Review Board likewise expressed "concern[] about the potential move so late in the case after [B.P.] has bonded significantly to the foster parents."

¶14  At the Nation's request, the court ordered DCS to facilitate virtual visits between B.P. and the Ohio placement, and simultaneously ordered an expedited best-interests and bonding assessment of the foster parents.

¶15  Dr. Mastikian, a licensed psychologist, conducted the best interests and bonding assessment in October. He interviewed the foster parents and watched them interact with B.P. through a two-way mirror for 30-45 minutes. After the assessment, Dr. Mastikian concluded that B.P.'s current foster parents were meeting his "basic and advanced needs," and "he has been thriving while in their care." He also considered the impact of the Nation's request to place B.P. in Ohio:

> It could be detrimental to the child's future cognitive, behavioral, and emotional development if he is hastily removed from his current placement and relocated to the home of a family who he has never met (despite them being from the same tribe and clan). Furthermore, the records indicate that the residuals of documented past trauma have made the child uncomfortable with change and anxious when his routine is disrupted.

¶16  Dr. Mastikian described "the child's concerning signs of behavioral and emotional decompensation since contact with the Ohio family began," recommended that visits between B.P. and the Ohio placement be suspended, and suggested that contact with the Ohio placement "be reconsidered in order to protect the child from undue distress which could potentially result in harm to the child" if the concerning behaviors did not abate.

¶17  Only two months into the virtual visits, in December 2020, DCS filed an emergency motion to suspend them, claiming that B.P. "reacted poorly" to the video calls, which triggered "alarming" behavior. According to DCS, the child "object[ed] to the calls," clung to his foster parents, "returned to bed-wetting after video visits," and "made self-harming gestures such as scratching himself and head banging."

*Evidentiary Hearing on Motion to Change Physical Custody*

**¶18** Between January and April 2021, the superior court conducted a five-day evidentiary hearing on the Nation's motion to change physical custody. By this time, B.P. had been in his foster placement for nearly three years.

**¶19** The court heard from several witnesses, including Dr. Mastikian and Michael Whitworth, a clinical therapist who had worked with B.P. since January 2020. Dr. Mastikian told the court it was not in B.P.'s best interest to be moved from his current foster home because he had formed a "secure and healthy attachment" with the foster parents. Stressing the importance of B.P.'s heritage, Dr. Mastikian said his opinion would have been "much different" if the foster parents were not "willing to keep the child connected**."** Mr. Whitworth testified about B.P.'s extreme reactions to the possibility of leaving the foster parents and his concerning responses to virtual visits with the Ohio placement. Dr. Mastikian told the court that B.P. would face serious emotional harm if removed from the foster parents.

**¶20** Celeste Smith and Dr. Priscilla Roth-Wall testified for the Nation. Ms. Smith testified that good cause was not present to deviate from ICWA's placement preferences after the Nation identified the Ohio placement, and explained the importance of raising B.P. in the Navajo culture. Dr. Roth-Wall, a clinical child psychologist, was hired a few months before the hearing and did not interview B.P., the foster parents or the Ohio placement. Based on Dr. Mastikian's report, she testified that B.P. "has as much as possible, as much as he is able, formed an attachment relationship with these foster parents," but shows signs of "ambivalent attachment."

**¶21** The court denied the Nation's motion on June 23, 2021, finding good cause to deviate from ICWA's placement preferences. The court stressed the evidence and testimony that B.P. would suffer psychological harm if moved from the foster parents to the Ohio placement:

> Here, the Court has been provided with examples of regression when the child felt insecure. The Court heard testimony that many of the behaviors, bed wetting, night tremors and scratching of the arms and face, were observed when the child had visits with Mother, if visits with Mother were suspended and video visits with the [Ohio placement].

> The Court draws the conclusion that the child regressed when the child felt his security was threatened.

**¶22** Among the factual findings in its lengthy order, the court found (1) the Nation had been timely notified and kept apprised of the dependency; (2) the Nation had not found an ICWA-compliant placement for B.P. until almost two years after he was removed and placed with the foster parents; (3) during that time, B.P. had developed a loving bond with the foster parents; (4) the foster parents had tried to nurture B.P.'s connection to the tribe; (5) the foster parents were prepared "to sign an agreement as a condition of adoption [that] would require continued contact" with the Nation; (6) B.P. had a "strong bond" with Mother and she nurtured his cultural roots; (7) the Nation believed this bond should continue; and (8) the foster parents would "maintain regular, in person contact" between B.P., Mother and maternal grandparents "for the foreseeable future." The court also concluded that ICWA could not have been violated until October 2020, when the Ohio placement was approved by ICPC; and, since then, "all statutes and rules were adhered to."

**¶23** The Nation appeals. We exercise our discretion to treat this appeal as a petition for special action and do not decide if we have independent jurisdiction under A.R.S. §§ 8-235(A) and 12-120.01(A)(1). *See Alexandra K. v. Dep't of Child Safety*, 1 CA-JV 19-0081, 2019 WL 5258095, at *2, ¶11 (Ariz. App. Oct. 17, 2019) (mem. decision).

## DISCUSSION

**¶24** The Nation contends the superior court erred by finding good cause to deviate from ICWA's placement preferences, arguing the court applied an incorrect burden of proof, mistakenly considered the bond between B.P. and the foster parents, and improperly considered the perspective and input of Mother after her parental rights were terminated. The Nation also makes two evidentiary arguments.

**¶25** We review de novo the interpretation and application of ICWA, *Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 534, ¶ 10 (App. 2015), but review a finding of good cause to deviate from ICWA preferences for an abuse of discretion, *Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 343, ¶ 14 (App. 2012).

7

*Indian Child Welfare Act of 1978*

**¶26** Congress passed the Indian Child Welfare Act of 1978 to promote the welfare of Indian children and preserve the stability of Indian tribes in response to "abusive child welfare practices" that separated Indian children "from their families and tribes through adoption or foster care placement." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 637 (2013) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)); *see also* 25 U.S.C. § 1902.

**¶27** ICWA hinges on "the fundamental assumption that it is in the Indian child's best interest" to protect his or her "relationship to the tribe." *Holyfield*, 490 U.S. at 50 n.24 (quoting *Pima Cnty. Juv. Action No. S–903*, 130 Ariz. 202, 204 (App. 1981)). To that end, ICWA sets forth a list of preferred placements for an Indian child: (1) a member of the child's extended family, (2) other members of the Indian child's tribe, or (3) other Indian families. 25 U.S.C. § 1915(a). ICWA then presumes that an Indian child's best interest is served when so placed.[1] To overcome the presumption, the party seeking to depart from ICWA's placements must show "good cause." *Navajo Nation*, 230 Ariz. at 345, ¶ 18. "In other words, absent other factors amounting to good cause to deviate from ICWA preferences, keeping a Native American child with his or her community and tribe is presumed to be in the best interests of the child as well as the tribe and community." *Id.* at 344–45, ¶ 17.

**¶28** ICWA does not define "good cause," leaving "state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* at 345, ¶¶ 19, 21 (quoting Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979)). To fill the definitional void, the Bureau of Indian Affairs offers guidance and five non-exhaustive factors, advising that a finding of good cause "should be based on one or more" of these factors:

- the request of one or both of the Indian child's parents if they attest that they have reviewed the ICWA placement options,

- the request of the child, if the child is of sufficient age and capacity,

---

[1] Arizona has a parallel state law, which recognizes the same order of preference. *See* A.R.S. § 8-815(B).

- the presence of a sibling attachment that can be maintained only through a particular placement,

- the extraordinary physical, mental, or emotional needs of the Indian child, such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live, and

- the unavailability of a suitable placement after a determination by the court that a diligent search was conducted.

25 C.F.R. § 23.132(c); *see also* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,777, 38,839 (June 14, 2016).

## I.     Standard and Burden of Proof

**¶29**     The Nation first argues the superior court applied an incorrect, lower standard to find "good cause."  The party that moves to depart from the Guidelines bears the burden to prove "good cause" by clear and convincing evidence.  *Gila River Indian Cmty.* at 536, ¶ 19.  We discern no error here.  The court correctly identified the clear and convincing standard in its order, and we presume the court applied the law correctly. *State v. Williams*, 220 Ariz. 331, 334, ¶ 9 (App. 2008).

## II.     Reasonable Evidence

**¶30**     The Nation next contends the superior court lacked the evidence to find good cause.  We review a finding of good cause to deviate from ICWA preferences for abuse of discretion.  *Navajo Nation*, 230 Ariz. at 343, ¶ 14.  We will uphold the court's findings unless not supported by reasonable evidence, and will not substitute our opinion for that of the trial court.  *Id.*

**¶31**     The superior court did not err.  The court heard expert testimony that B.P. would suffer emotional harm if separated from the foster parents he has known for most of his life, jeopardizing his stability and security.  *See Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (child's interest in stability and security "must be the court's primary concern" in custody proceedings).  The record reveals that B.P. formed a close bond to his foster parents of three years, whom he called "mom" and "dad," and that B.P. would suffer severe emotional distress and regression if he were to be removed.  *See Maricopa Cnty. Juv. Action No. A-25525*, 136 Ariz. 528, 534 (App. 1983) (child's removal from placement with whom it bonded would cause "psychological damage" relevant in finding good

cause to deviate from ICWA's adoptive placement preference). B.P. had lived with the same foster parents for much of his life.

¶32 The record shows that B.P. continued to enjoy a "strong bond" with Mother. The court also emphasized the foster parents' commitment to maintaining B.P.'s Navajo roots and their willingness to facilitate that relationship with Mother and his maternal grandparents. *See Navajo Nation*, 230 Ariz. at 349, ¶ 38 ("While the record shows that it would be easier for [the child] to be exposed comprehensively to Navajo culture by living with a Navajo family, there is evidence supporting the juvenile court's finding that he could still be so exposed through the cooperative efforts of his relatives and the current placement.").

¶33 The Nation counters with unpersuasive arguments that would narrow the best-interests inquiry. The Nation argues the court should not have considered B.P.'s bond with his foster parents. We disagree. A child's best interest invariably controls in all child custody proceedings, and state courts must consider all factors bearing on that interest. *See Navajo Nation*, 230 Ariz. at 345, ¶¶ 18, 24; *see also Gila River Indian Cmty.*, 238 Ariz. at 536, ¶ 20 ("[G]ood cause is ultimately a matter of discretion, which is to be exercised in light of myriad factors specific to a given case."). Thus, "[w]e have determined that in finding good cause under ICWA, a court may appropriately consider a child's bonding and attachment to a family and any emotional distress the child would experience if removed." *Navajo Nation*, 230 Ariz. at 346, ¶ 25 (collecting cases).

¶34 The Nation also asserts that the court should not have considered Mother's thoughts on placement because her parental rights had been terminated. But the Nation offers no authority for that argument, and courts from across the nation have rejected similar arguments. *See, e.g., Matter of Adoption of F.H.*, 851 P.2d 1361, 1364–65 (Alaska 1993) (trial court properly considered natural mother's request that child remain with non-Indian adoptive placement, even though natural mother's parental rights were terminated; mother had a relationship with the child that would continue after adoption); *In re B.B.A.*, 224 P.3d 1285, 1288, ¶ 11 (Okla. Civ. App. 2009) (court properly considered biological parents' request that child remain with non-Indian foster placement, even after father relinquished his parental rights); *In re Adoption of B.G.J.*, 133 P.3d 1, 10 (Kan. 2006) (court properly considered "adamant" request of Indian child's birth mother, who

relinquished her parental rights, "that her child be placed with the adoptive parents, and not with her extended family or the Tribe").[2]

¶35 Moreover, the Nation's argument is inconsistent with our primary concern, which is B.P.'s best interest. *See* A.R.S. § 8-116; *see also J-A-25525*, 136 Ariz. at 533-34 ("[I]t must be remembered that it is the child's best interests which are of primary concern in adoption proceedings."). Although Mother lost her parental rights, she was not ordered to stay away from the child who loves her and enjoys her company.

### III.    DCS Did Not Violate ICWA

¶36 The Nation next argues that DCS and the superior court violated ICWA, but the Nation offers no legal or factual basis for its position. Even so, the record shows no violation. ICWA required DCS to provide the Nation with formal notice of the dependency, which it did. *See* 25 U.S.C. § 1912(a); *see also State in Interest of P.F.*, 405 P.3d 755, 762, ¶ 29 (Utah Ct. App. 2017) (describing "the only requirement [as] provid[ing] notice to the child's custodians and tribe"). DCS petitioned for dependency on June 1. A DCS representative called the Nation and left a voicemail on June 4 because Mother said she was a member. DCS formally notified the Nation about the dependency proceedings by certified letter on July 5. The Nation then agreed that good cause existed to place B.P. with his non-Indian foster parents until late February 2020—almost 21 months after removal. And it was not until October 2020, when the Ohio ICPC office approved the Nation's preferred placement, that DCS could have placed B.P. in Ohio. The record does not show that DCS ignored ICWA or the Nation.

### IV.    Evidentiary Arguments

¶37 The Nation contends the superior court should have excluded Dr. Mastikian's expert testimony under Arizona Rule of Evidence 702. We review the court's evidentiary decision for an abuse of discretion and will not disturb the decision if "supported by any reasonable evidence." *Lohmeier v. Hammer*, 214 Ariz. 57, 61, ¶ 7 (App. 2006) (citation omitted).

¶38 The court did not abuse its discretion. Dr. Mastikian is a licensed psychologist who met with B.P. and the foster parents to conduct

---

[2]    The Nation cites *In re C.B.D.*, 394 P.3d 202, 204 (Mont. 2017), but that case involved standing for placement decisions after parental rights were terminated. *Id.* Mother does not assert legal standing here, and the court may consider her input as one of several factors in favor of good cause.

a bonding assessment at the superior court's direction.  Dr. Mastikian had performed these bonding assessments for several years and he possessed specialized knowledge about the severe mental distress that might befall B.P.  *See State v. Boyston*, 231 Ariz. 539, 544, ¶ 14 (2013).  And at most, an expert's relative inexperience with ICWA would impact the weight of testimony, not its admissibility.  *See McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 251, ¶ 16 (App. 2013) (safety expert's "background and familiarity with certain building regulations goes to the weight of his testimony, not its admissibility").

## CONCLUSION

¶39          We accept jurisdiction but deny special action relief.

