284 P.3d 29

**NAVAJO NATION, Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY,
Z.,[1] Appellees.**

**No. 1 CA–JV 11–0123.**

Court of Appeals of Arizona,
Division 1, Department B.

Aug. 28, 2012.

As Amended Sept. 5, 2012.

---

1. We amend the caption by using the child's first initial to ensure the confidentiality of the child.

All future pleadings shall use the amended caption.

Navajo Nation Department of Justice By Cherie Espinosa, Staff Attorney, Window Rock, Attorney for Appellant.

Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg By April E. Olson, Tempe, Attorneys for Appellant.

Thomas C. Horne, Arizona Attorney General By Dawn R. Williams, Assistant Attorney General, Tucson, Attorneys for Appellee.

## OPINION

KESSLER, Judge.

¶ 1 The Navajo Nation ("the Nation") appeals the juvenile court's judgment finding good cause to deviate from the placement preferences set forth in the Indian Child Welfare Act of 1978 ("ICWA"), 25 U.S.C. §§ 1901 to 1963 (2006), and allowing the child ("Z.") to remain with his current non-relative, non-Indian adoptive placement. We affirm. The juvenile court properly found good cause to deviate from ICWA placement preferences because the placement family provided good care for Z., Z. had attached and bonded with the family, Z. would suffer severe distress if he was removed from that placement, the placement family would expose Z. to his Navajo culture, and the placement family had been approved to adopt Z. While the interest of the Nation and the Congressionally-presumed interest of Z. in maintaining his heritage weighed against a finding of good cause to deviate from ICWA's preferences, on this record we cannot say the court erred in weighing all these interests.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The alleged father's ("B.") brother and sister-in-law ("the current placement") rescued Z. from his parents' home and began caring for him when he was one month old.[2] In August 2010, a private dependency petition was filed against Z.'s biological mother ("Mother") and B., based on neglect and abandonment. At the time of the petition, Z. had been living with the current placement for six months.

¶ 3 At the preliminary protective hearing in August 2010, the juvenile court substituted the Arizona Department of Economic Security ("DES") as the petitioner and was informed that ICWA applied. The court ordered genetic testing and scheduled a dependency hearing for October 2010. DES notified the Nation in writing of the pending dependency and the October hearing on September 20. The Nation appeared at the October 12 hearing but did not provide any placement information. At the request of DES, the court continued the hearing until December to permit ICWA testimony.

¶ 4 In December 2010, the court held a continued initial dependency and permanency planning hearing. The Nation did not appear. At this point, Z. had been with the

---

2. The dependency petition alleged that the current placement found Z. living in a drug house infested with cockroaches, and that Z. had not seen a doctor or been bathed since his birth.

current placement for approximately ten months. Based on the evidence presented, the court authorized DES to file a motion to terminate parental rights, but did not make a dependency finding because no ICWA evidence had been presented. The court scheduled the continued dependency hearing and initial severance hearing for January 18, 2011, to permit ICWA evidence to be introduced. The court dismissed B. as a party when genetic testing revealed he was not Z.'s biological father.[3]

¶5 On January 7, 2011, DES filed its motion to sever Mother's and the John Doe father's parental rights, and alleged Mother was an enrolled member of the Navajo Nation. That same day, DES sent the Nation the motion and notice of the hearing by certified mail. The Nation appeared telephonically at that hearing. The court found DES presented a factual foundation for termination of parental rights. As to the current placement with B.'s relatives, the Nation conceded Z. was currently "in a healthy, loving home." The court recognized that the current placement was not consistent with ICWA placement preferences and deferred any final findings as to whether good cause existed for such placement until after a March 1 hearing.[4] However, the court indicated DES had shown good cause to deviate from ICWA placement preferences because Z. had been in the current placement almost his entire life where he caught up on developmental milestones, and no party offered alternative homes consistent with ICWA.

¶6 On January 27, the Nation successfully moved to intervene, confirming that it had verified in December that Z. was eligible for enrollment.[5] At this point, Z. had been with the current placement for almost eleven months. While the motions were pending, the Foster Care Review Board issued a report stating that Z. was bonding with the current placement and that DES wrote Mother a letter requesting information on relatives. The Nation indicated that the case had been assigned in December 2010, that it visited Z. once in the current placement, and that although Mother's whereabouts was unknown, it intended to identify an adoptive home for Z.

¶7 At the March 1 hearing, the Nation did not contest the severance, but objected to the current placement because it did not fall within ICWA preferences. In addition, the Nation expressed concern over the current placement's unemployment, and one of the couple's criminal history and prior terminations of parental rights. The parties informed the court that while a home study revealed Z.'s maternal grandmother to be an inappropriate placement, Mother had recently provided the names of six additional relatives. Although the court encouraged DES to consider the relative placements, it found that good cause existed to deviate from ICWA preferences. The court issued a minute entry terminating parental rights and finding good cause to continue the current placement because Z. had established a bond with them and removal from that home could result in psychological trauma. After the Nation filed a motion for reconsideration, the court held an evidentiary hearing to determine if good cause existed to deviate from ICWA placement preferences.

¶8 By the time of the good cause hearing, Z. had been with the current placement for fifteen months. In opposing that placement, Cassandra Gorman ("Gorman"), the Nation's expert witness, testified about the importance of Navajo culture in child upbringing, the difficulty in teaching the culture to a child raised in a non-Navajo family, and the consequences if milestones and ceremonies are not honored or performed. Gorman also testified about the Nation's efforts in managing the case, and informed the court that the Nation had found an ICWA-compliant placement with Z.'s maternal grandmother's sister. Gorman further testified in regard to

---

**3.** No other father has been identified and the later termination of the John Doe father's rights is not at issue in this appeal.

**4.** The court also stated that there was good cause to deviate from ICWA preferences for the current dependency. We construe that finding to relate

only to the dependency until the later hearing scheduled for March.

**5.** The Nation also moved to transfer jurisdiction to the tribal court, but later withdrew the motion based on Mother's objection.

the current placement, and cited financial instability and a past criminal history as to one of the couple as a cause for concern.

¶ 9 The juvenile court also heard testimony from Dr. Glenn Moe, a licensed psychologist who performed an attachment and best interests assessment on Z. in May 2011. Dr. Moe testified it was in Z.'s best interest to remain in the current placement. Dr. Moe also testified that a reciprocal bond had been formed, and that Z. would face a significant risk of emotional disturbance if removed from the home. In addition, Dr. Moe testified to the current placement's willingness to expose Z. to Navajo culture and promote relationships with Z.'s biological family. He concluded that by staying with the current placement Z. would not suffer from loss and separation, and could still grow up with an understanding of Navajo culture, heritage, and language.

¶ 10 The juvenile court concluded there were five reasons for good cause to deviate from ICWA preferences: the current placement had rescued and provided good care to Z.; Z. had significantly attached and bonded with the current placement; removing Z. would cause emotional damage; the current placement would expose Z. to Navajo culture and heritage as well as to African–American heritage; and the current placement had been approved to adopt Z. As the court summarized its holding:

> The Child ... has been [with the current placement] for 15 of the 16 months of his life. Essentially, these are the only parents the Child has ever known. The Child and the [current placement] are bonded with each other.... It was the [current placement], not the Navajo Nation who rescued the Child from deplorable living conditions.... The Child will suffer detriments—including certain emotional and psychological damage, which has the potential to be profound—if removed from the [current placement]. The proposed Navajo [relative] placement ... has no relationship or bond with the Child. The Child will be exposed to his multi-ethnic culture, including the Navajo culture, if raised by the [current placement]. And, finally, there is no need to move the Child

from the [current placement], as they have been certified to adopt.

¶ 11 The court also addressed the Nation's delay in trying to find an ICWA-preferred placement, which while not dispositive, resulted in having Z. bond with the current placement. Balancing that delay against the benefits to having Z. stay with the current placement, the court concluded that "it is contrary to the best interests of the Child, and would be horribly detrimental to the Child, to rob him of the only parents he has ever known, loved and bonded with."

¶ 12 The Nation timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8–235(A) (2007) and 12–120.21(A)(1) (2003).

## DISCUSSION

¶ 13 The Nation makes two arguments why we should reverse the juvenile court's good cause determination. First, it argues the court erred as a matter of law in considering the above factors as evidence of good cause to deviate from ICWA preferences. It contends that the Bureau of Indian Affairs Guidelines ("Guidelines") offer the exclusive factors permitting deviation from ICWA placement preferences. Alternatively, the Nation argues that any reason for deviation must be equivalent to those in the Guidelines. As part of that argument, the Nation argues that DES acted improperly in not immediately searching for a Native American family with whom to place Z. upon learning the current placement was not biologically related, and the court erroneously concluded that the Nation was guilty of delay and unclean hands and was using that as a basis to place Z. with a non-Indian family. Second, the Nation argues that the evidence does not support the five factors the court relied upon to deviate from ICWA preferences or the court improperly weighed those factors.

¶ 14 We review a finding of good cause to deviate from ICWA preferences for an abuse of discretion. *Maricopa Cnty. Juv. Action No. A–25525*, 136 Ariz. 528, 533, 667 P.2d 228, 233 (App.1983). "An appellate court will not substitute its own opinion for that of the trial court, and findings of the

trial court will be upheld unless they are unsupported by the evidence." *Id.* (citation omitted). However, an erroneous interpretation of a statute can constitute an abuse of discretion. *State v. Slover,* 220 Ariz. 239, 242, ¶ 4, 204 P.3d 1088, 1091 (App.2009). "We review issues of statutory interpretation de novo. In interpreting ICWA, we attempt to give effect to the will of Congress as expressed in the statutory language, which we construe liberally in favor of the interest in preserving tribal families." *Valerie M. v. Ariz. Dep't of Econ. Sec.,* 219 Ariz. 331, 334, ¶ 10, 198 P.3d 1203, 1206 (2009). We will affirm the juvenile court for any correct reason supported by the record. *St. Joseph's Hosp. v. Ariz. Health Care Cost Containment Sys.,* 185 Ariz. 309, 312, 916 P.2d 499, 502 (App.1996).

## I. ICWA

¶ 15 "Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships." *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 34, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (internal quotation marks omitted). Having "assumed the responsibility for the protection and preservation of Indian tribes and their resources," 25 U.S.C. § 1901(2), Congress enacted ICWA in response to the "breakup of Indian families and the placement of Indian children, at an alarming rate, with non-Indian foster or adoptive homes." H.R.Rep. No. 95–1386, at 19 (1978), 1978 U.S.C.C.A.N. 7530 at 7541. Recognizing "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," 25 U.S.C. § 1901(3), ICWA serves to provide "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

¶ 16 As the Supreme Court emphasized in *Holyfield,* 490 U.S. at 36–37, 109 S.Ct. 1597, the centerpiece of that goal is the Congressional mandate in 28 U.S.C. § 1915(a) that absent "good cause," adoptive placements be made in accordance with ICWA preferences for members of the child's extended family, then other members of the same tribe, and then other Indian families. After that, the preferences are a foster home approved by the tribe, an Indian foster home approved by a non-Indian licensing authority, or an institution approved by an Indian tribe. 25 U.S.C. § 1915(b).[6]

¶ 17 Moreover, as the Supreme Court noted in *Holyfield,* ICWA "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." 490 U.S. at 37, 109 S.Ct. 1597 (internal quotation marks omitted); *see also id.* at 49–50, 109 S.Ct. 1597 ("[I]t is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture."). ICWA "is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected." *Holyfield,* 490 U.S. at 50 n. 24, 109 S.Ct. 1597 (quoting *Pima Cnty. Juv. Action No. S–903,* 130 Ariz. 202, 204, 635 P.2d 187, 189 (App. 1981)). In other words, absent other factors amounting to good cause to deviate from ICWA preferences, keeping a Native Ameri-

---

6. 25 U.S.C. § 1915(b) provides that:
Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, *in the absence of good cause to the contrary,* to a placement with—
(i) a member of the Indian child's extended family;
(ii) a foster home licensed, approved, or specified by the Indian child's tribe;
(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
(Emphasis added.)

can child with his or her community and tribe is presumed to be in the best interests of the child as well as the tribe and community.

¶ 18 In this context, the lodestar for a court is essentially the same as with other custody and placement issues the best interests of the child. *A–25525*, 136 Ariz. at 534, 667 P.2d at 234. When compared to non-ICWA cases, the difference is that Congress has spoken and unless good cause is shown, the presumption is that placement of the child in accordance with ICWA preferences *is* in the best interest of the child.

¶ 19 Because ICWA does not define "good cause," we look to the Guidelines for non-binding guidance on how to interpret "good cause." *See Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 572, ¶ 24, 190 P.3d 180, 186 (2008) (citing *Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed.Reg. 67,584 (Nov. 26, 1979)). The Guidelines provide that:

> For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference. shall be based on one or more of the following considerations: (i) The request of the biological parents or the child when the child is of sufficient age. (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness. (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

44 Fed.Reg. at 67,594.

## II. FACTORS TO CONSIDER FOR GOOD CAUSE

¶ 20 It is undisputed that none of the Guidelines' factors for good cause are present: (1) Mother did not request the court to deviate from ICWA, nor is Z. of sufficient age to make such a request; (2) the expert witnesses did not testify that Z. had any extraordinary physical or emotional needs requiring deviation from placement preferences; and (3) as recognized by the juvenile court, a suitable relative placement was available. However, as noted above, the Guidelines are not exclusive and are advisory in nature, so we need not limit our inquiry for good cause to these factors.

### A. BEST INTERESTS

¶ 21 Based both on federal law and Arizona precedent, we reaffirm that in determining the best interest of the Indian child, both the juvenile court and this Court should start with the presumption that ICWA preferences are in the child's best interest and then balance that presumption against other relevant factors to determine whether placement outside ICWA preferences is in the child's best interest. "[T]he legislative history of [ICWA] states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." 44 Fed.Reg. at 67,584. In interpreting ICWA, we have held that Congress intended that the child's best interests be considered in placement along with the child's ties to the tribe:

> [I]t must be remembered that it is the child's *best interests* which are of primary concern in adoption proceedings. Similarly, the congressional declaration of policy behind the ICWA emphasizes that the first interest Congress seeks to protect is that of Indian children. *It is patently clear that Congress envisioned situations in which the child's best interest may override a tribal or family interest ....* Of course, the need to maintain an Indian child's ties to his or her tribe is not to be ignored where the ICWA is applicable.

*A–25525*, 136 Ariz. at 533–34, 667 P.2d at 233–34 (emphasis added) (citations omitted).

¶ 22 Our conclusion is consistent with other jurisdictions which consider other factors relating to the child's best interests in determining whether good cause exists to place the child outside ICWA preferences. *See, e.g., In re A.E.*, 572 N.W.2d 579, 585 (Iowa 1997) ("[T]he best interests of the child is but one factor, among many, that the court may consider. The BIA guidelines contain language that suggests state courts have discretion to include the best interests standard as a factor on the question of good cause."); *In re Interest of Bird Head*, 213 Neb. 741, 331

N.W.2d 785, 791 (1983) ("[ICWA] does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus."); *In re Adoption of F.H.*, 851 P.2d 1361, 1363–64 (Alaska 1993) ("Whether there is good cause to deviate in a particular case depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe.").

¶ 23 Relying on this flexibility, the juvenile court expressly considered Z.'s best interests in its ruling:

The Navajo Nation's interest is not the only interest this Court must balance. ICWA expressly recognizes this insofar as the ICWA placement preference is not absolute. Instead, the Court is permitted by ICWA to deviate from the placement preference if there is "good cause" for the deviation. This standard permits the Court to consider other matters, including the best interests of the Child.[7]

¶ 24 This is not to say that a deviation from ICWA's statutory preferences can be based simply upon the court's perception of other statutory best interest factors without regard to the ICWA presumption. The factors used to determine best interests are case-specific, but in all cases must be balanced against the statutory presumption that placement consistent with ICWA preferences is in the best interest of the child. We are not persuaded by the Nation's arguments that the court's reliance on various factors to find good cause was either erroneous as a matter of law or not sufficiently supported by the record.

### 1. Bonding, Attachment, and Emotional Distress [8]

¶ 25 We have determined that in finding good cause under ICWA, a court may appropriately consider a child's bonding and attachment to a family and any emotional distress the child would experience if removed. *See A–25525*, 136 Ariz. at 534, 667 P.2d at 234 (bonding and psychological damage relevant factors in finding good cause to deviate from ICWA preferences); *Maricopa Cnty. Juv. Action No. JS–8287*, 171 Ariz. 104, 110, 828 P.2d 1245, 1251 (App.1991) (considering bond with foster parents a relevant factor to finding good cause in denying a transfer of jurisdiction under ICWA).

¶ 26 The Nation attempts to minimize such factors here, arguing that: (1) the reason for Z.'s bonding with the current placement is that DES failed to actively search for an ICWA-compliant placement once it realized that Z. was a Native American child and not biologically related to the current placement; (2) typical bonding is insufficient to constitute good cause unless breaking that bond would be accompanied by significant emotional distress, which is not present here; and (3) the bonding here was not of the same significance as in other Arizona cases dealing with good cause under ICWA.

¶ 27 We reject the claim that DES did not diligently search for an Indian placement for Z. and that failure to do so violated ICWA. First, the Nation cites no legal authority for such a claim. We will not consider arguments made without legal authority. *Cullum v. Cullum*, 215 Ariz. 352, 355 n. 5, ¶ 14, 160 P.3d 231, 234 n. 5 (App.2007). To the extent the Nation relies on *In re Desiree F.*, 83 Cal.App.4th 460, 99 Cal.Rptr.2d 688 (Cal.Ct.App.2000), we find that case distinguishable. In *Desiree F.*, California's equivalent of DES failed to notify the tribe of the proceedings, provided no expert testimony in support of severance, rejected the tribe's efforts to intervene, and without good cause, failed to place the child with extended family members. 83 Cal.App.4th at 466–68, 99 Cal.

---

7. To the extent the juvenile court implied that ICWA preferences are not a best interest factor, we disagree. As *Holyfield* made plain, except for good cause, ICWA's presumption is that placement pursuant to ICWA preferences is in the child's best interest. 490 U.S. at 50 n. 24, 109 S.Ct. 1597.

8. The juvenile court also considered the fact that the current placement had rescued Z. from the home of Mother when he was one month old. We construe this factor to be part of the bonding and attachment issue because the court simply described the deplorable state of Mother's home and that the current placement has provided Z. with a loving and stable home since then.

Rptr.2d 688. Based on these facts, the California Court of Appeal determined that "[f]actors flowing from [a child's] current placement in flagrant violation of the ICWA, including but not limited to bonding with [the] current foster family and the trauma which may occur in terminating that placement, shall not be considered in determining whether good cause exists to deviate from the placement preferences set forth in the ICWA." *Id.* at 476–78, 99 Cal.Rptr.2d 688. In this case, DES properly notified the Nation of the proceedings pursuant to 25 U.S.C. § 1912(a) in September 2010, one month after the private dependency was filed, and the placement was originally thought to be in compliance with ICWA until genetic testing revealed the alleged father and Z. were not related. In addition, the Nation's representative testified that it worked with DES to locate relatives and that DES was open to the possibility of transitioning Z. to a Navajo or relative placement. These actions do not constitute a "flagrant violation" of ICWA. As a result, in these circumstances, we find the court did not abuse its discretion in considering Z.'s bond with the current placement in making its determination.

¶ 28 Second, the record does not support a claim that DES's failure to search for a Navajo home resulted in a bond by default. DES did not file the original petition alleging ICWA applied. As the Nation conceded, although it had notice of the petition as early as September, it could not determine Z.'s status until December and even at that point had not found a preferred placement under ICWA. Part of this problem was that neither DES nor the Nation was able to locate Mother. At that point, Z. had been in the current placement for almost ten months.

¶ 29 The Nation also argues that bonding by itself is insufficient to amount to good cause unless it is accompanied by significant emotional distress or harm to the child if he or she is removed from the placement. To support its argument, the Nation relies on *In re C.H.*, wherein the Montana Supreme Court stated that:

> [The] conclusion that an Indian child should be placed with a non-Indian foster parent because of a strong emotional bond is essentially a determination that it is in the child's best interests to be so placed.... [W]hile the best interests of the child is an appropriate and significant factor in custody cases under state law, it is an improper test to use in ICWA cases because the ICWA expresses the presumption that it is in an Indian child's best interests to be placed in accordance with the statutory preferences.

299 Mont. 62, 997 P.2d 776, 784, ¶ 29 (2000) (citation omitted). The conclusion that a strong emotional bond is trumped by ICWA, however, is contrary to law.

¶ 30 As noted above, *supra* ¶ 25, we have previously held that bonding and the risk of emotional harm are relevant factors in finding good cause to deviate from ICWA placement preferences. *See A–25525*, 136 Ariz. at 534, 667 P.2d at 234. Moreover, the juvenile court here did not rely on mere bonding, but also made findings that removing Z. from the only family he had known for fifteen of the first sixteen months of his life would have "horribly detrimental" consequences. Consequently, we cannot find that bonding was an improper factor for the court to consider.[9]

¶ 31 The Nation also argues that the juvenile court erred in considering the emotional damage Z. would suffer if moved from the current placement. The Nation relies on *In re C.H.* to argue that "[t]he risk that a child might develop ... problems in the future is simply too nebulous and speculative a standard on which to determine that good cause exists...." 997 P.2d at 783, ¶ 27. While the Montana Supreme Court's decision in *In re C.H.*, is not binding on us, in that case there was no evidence that physical or emotional

---

9. This does not mean that an emotional bond with a non-ICWA preferred family always trumps ICWA preferences as a matter of law. As the Supreme Court noted in *Holyfield*, the law cannot be applied to automatically "reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." 490 U.S. at 54, 109 S.Ct. 1597 (internal quotation marks omitted). However, bonding is one factor which a court should weigh in determining best interests and good cause. *See A–25525*, 136 Ariz. at 534, 667 P.2d at 234.

348

trauma either existed or was inevitable, only that there was the potential for it to occur. *Id.* at ¶ 26. In fact, the court recognized that it has "held that emotional or physical trauma to a child resulting from a change in custody can constitute good cause to avoid the ICWA placement preferences," but only when "trauma is certain to result from a transfer of custody." *Id.*

¶ 32 We disagree with *In re C.H.* Interpreting ICWA to require an expert to testify that trauma is certain to result from a transfer of custody or if a certain placement is or is not made cannot be in a child's best interest. Prediction of psychological or emotional harm is not an exact science. All we can expect is that, given the expert's experience, there is a reasonable prospect for significant emotional harm to the child by removal from a home. The record contains evidence supporting the court's conclusion that removal of Z. from the only home he had known for fifteen of the sixteen months of his life would have caused emotional harm. Dr. Moe testified that there was a significant risk for potential emotional disturbance if Z. was removed from the current placement. While he could not say how severe that would be, Dr. Moe testified it would be the "same type of risk for emotional disturbance I would expect if any child were removed at this age from parental figures he perceives to be his parents." Given the fact that Z. had been in the current placement since he was approximately one month old and was there for almost fifteen months at the time of the June 2011 good cause hearing, the court was well within its discretion to consider such distress as very harmful to him.

¶ 33 Third, the Nation contends that the bonding and potential distress present here are not similar to prior Arizona decisions in which we found good cause based on bonding and emotional harm. The Nation attempts to distinguish those cases based on the amount of time the child had spent in the home from which he was going to be removed. However, a child's bond with caregivers and the resulting harm from removal is not simply a factor of the time the child spends with those caregivers, but also the quality of that time and when during child-

hood that bonding occurs. A child may be placed in a home for years, but not develop deep bonds with the family. On the other hand, a child may be living with a family for a shorter period of time and develop incredibly deep bonds, especially if the child is at a young age and the family provides meaningful care and love. Those factors have to be weighed by the juvenile court based on the unique circumstances of each case, and we will not reverse such findings unless they are unsupported by evidence. *A–25525*, 136 Ariz. at 533, 667 P.2d at 233.

¶ 34 The record contains evidence that Z. bonded with his current placement and that removing him from his home after fifteen months of bonding would have caused significant harm. Accordingly, the juvenile court did not err in relying on these factors among others in finding good cause to deviate from ICWA preferences.

### 2. Exposure to Navajo and African–American Cultures

¶ 35 The Nation also argues that the court did not give sufficient weight to whether the current placement would permit Z. to be exposed to Navajo culture and that the court erred in considering the potential for exposure to African–American culture in the current placement. We conclude the record does not support a reversal on these two factors.

¶ 36 First, one of the purposes of ICWA preferences is to ensure the child is adequately exposed to his or her Native American culture. *Supra* ¶ 15. Clearly, the court considered this factor in its ruling. However, the Nation argues that exposure to the Navajo culture is insufficient in a non-Navajo home because such exposure must be learned from daily ceremonies and language which can only be given in a Navajo home and setting.

¶ 37 We review the record in the light most favorable to affirming the juvenile court's decision. *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 95, ¶ 10, 210 P.3d 1263, 1266 (App.2009). Gorman testified that it is extremely difficult for a Navajo child to be exposed to Navajo culture when living

with a non-Navajo family because the culture is transmitted through daily life, ceremonies, and language. However, she also stated that when she met with the current placement a week before the good cause hearing and explained the need to have "cultural maintenance," the current placement was willing to take steps to expose Z. to Navajo culture. She also testified that Z.'s Navajo relatives were willing to assist in exposing him to the culture. Z.'s maternal grandmother's sister also agreed that while she thought it would be better to have Z. placed with her, she would attempt to expose him to Navajo culture even if he remained with his current placement.

¶ 38 While the record shows that it would be easier for Z. to be exposed comprehensively to Navajo culture by living with a Navajo family, there is evidence supporting the juvenile court's finding that he could still be so exposed through the cooperative efforts of his relatives and the current placement. Thus, we cannot conclude the court erred in evaluating this factor when balancing all of the factors to determine whether good cause existed to deviate from ICWA preferences.

¶ 39 The Nation makes a stronger argument that exposure to African–American culture is not significant in this case because paternity testing showed that B. is not the biological father. While Z.'s non-Indian racial background has little if any bearing on the statutory considerations affecting placement here, we conclude that the juvenile court's mention of this factor was relatively minor given its emphasis on bonding, attachment, and emotional harm. Accordingly, we cannot say that citation of this one fact requires reversal.

### 3. Adoption Certification

¶ 40 The Nation also contends the juvenile court erred in considering the alleged fact that the current placement had been certified to adopt. The Nation argues that this was erroneous because it was hear

say, there is evidence that the husband in the current placement was convicted of a felony involving domestic violence which would preclude fingerprint clearance for certification, and in any event, certification cannot amount to good cause because that would mean every adoption placement would trump ICWA preferences. In response, DES contends there is no evidence the husband was convicted of an offense which would preclude adoption certification, there was no objection to the introduction of the certification, and the court only considered this factor for purposes of permanency in Z.'s life.

¶ 41 The juvenile court did not abuse its discretion in considering the certification. First, the evidence of record is found in the home study report of the current placement done in September 2010. The husband self-reported that he was convicted in 1998 in California of a felony involving domestic violence with a prior significant other, but was scheduled to complete parole in November 2010 at which time the charge would be reduced to a misdemeanor. Thus, the conviction did not necessarily preclude the required fingerprint clearance.[10] The Nation never sought to introduce evidence of the nature of the offense or whether it was reduced to a misdemeanor.

¶ 42 In addition, the Nation did not object to Dr. Moe's testimony that the certificate had been issued. While the Nation objected to the admission of his report on hearsay grounds, the court overruled that objection, holding that appropriate foundation had been laid and the report had been authenticated. The court added that if the Nation wanted to object to a portion of the report, it could raise any hearsay objection and ask the Court to disregard that hearsay. At the conclusion of the hearing, the Nation only asked for a copy of the certificate and asked the court to reconsider the certification. We will not consider a hearsay objection on appeal if it was not preserved below. *See Adrian E. v. Ariz. Dep't of Econ. Sec.,*

10. Pursuant to A.R.S. § 41–1758.07(B)(41) (Supp.2011), at the time of the underlying proceedings a person convicted in Arizona or another state of "[a]ny felony offense involving domestic violence as defined in § 13–3601 except for a felony offense only involving criminal damage" could not obtain the necessary fingerprint clearance needed for an adoption certificate as required by A.R.S. § 8–105(D) (Supp.2011).

215 Ariz. 96, 103, ¶ 24, 158 P.3d 225, 232 (App.2007). If such hearsay is admitted without an objection, it is competent evidence to be considered for all purposes. *Starkins v. Bateman*, 150 Ariz. 537, 544, 724 P.2d 1206, 1213 (App.1986).

¶ 43 Nor do we conclude that this issue was one that was significant for the juvenile court. In its ruling, the court only pointed out that the Nation requested at the close of the good cause hearing that the court reconsider a ruling of a different judge determining that the current placement should be certified to adopt. To the extent the court considered this issue at all it was simply because the record showed Z. "is living in an adoptive placement with whom he is bonded and has been placed for 15 of the 16 months of his life." Thus, contrary to the Nation's argument, we cannot conclude that the court's reliance on this one factor means that certification is tantamount to good cause.

## B. DELAY IN THE NATION'S INVOLVEMENT

¶ 44 Finally, the Nation argues that the court erred in considering the Nation's alleged failure to become involved earlier in the proceedings. In its ruling, the court expressed concerns with the Nation's apparent lack of diligence in managing the case. While we agree with the Nation that it would be inappropriate to place a child with a non-Indian family simply because of lack of diligence by a Native American tribe, we disagree that this is what occurred here.

¶ 45 With respect to the breakup of Indian families and the placement of Indian children in non-Indian homes, Congress acknowledged that "[c]ontributing to this problem has been the failure of state officials, agencies, and procedures to take into account the special problems and circumstances of Indian families and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future." H.R.Rep. No. 95–1386, at 19, 1978 U.S.C.C.A.N. 7530 at 7541. We, therefore, agree with the Nation that ICWA applies to state court dependency and severance actions, regardless of whether a tribe intervenes.

¶ 46 In a related context, our supreme court has reminded us that the conduct of one of the parties in litigation is not to be sanctioned in a manner that will affect the best interests determination for the child. *Hays v. Gama*, 205 Ariz. 99, 103–04, ¶¶ 21–24, 67 P.3d 695, 699–700 (2003) (finding trial court erred in imposing sanction precluding admission of evidence which would affect best interest determination of child).

¶ 47 However, we disagree with the Nation that the juvenile court considered the alleged lack of diligence of the Nation as a factor on which to base placement. As described by the court, there clearly was delay in the Nation's involvement. Thus, despite the Nation having been informed of the case and that Z. was subject to ICWA in September 2010, the Nation did not confirm he was entitled to enrollment in the Nation until December, did not attempt to find a Navajo family for placement until January, and did not inform the court of any such placement until June 2011. The record suggests reasons for such delays, including the caseload of the Nation's social workers and the fact that for a good part of that period no one could find Mother to determine if Z. was subject to ICWA and to find relative placements in the Nation.

¶ 48 The record shows, however, that the crux of the juvenile court's concern was with moving Z. from the only family he had known for the vast majority of his life to a family that he had never met. As the court made clear in its ruling, moving Z. after fifteen months would have a devastating effect on him. Thus, we construe the court's comments about the alleged delay not as a sanction-based factor, but to explain that the delay in finding an alternative placement contributed to the continued bonding of Z. with the current placement. We conclude the court did not abuse its discretion in considering this factor.

## CONCLUSION

¶ 49 For the foregoing reasons, the judgment of the juvenile court is affirmed.

CONCURRING: MARGARET H. DOWNIE, Presiding Judge and PETER B. SWANN, Judge.