NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ALEXANDRA K.,
*Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY,
NAVAJO NATION, I.G.,
*Appellees*.

No. 1 CA-JV 19-0081
FILED 10-17-2019

Appeal from the Superior Court in Maricopa County
No. JD527122
The Honorable Karen L. O'Connor, Judge

**JURISDICTION ACCEPTED; RELIEF DENIED**

COUNSEL

McCarthy, Weston, PLLC, Flagstaff
By Philip (Jay) McCarthy, Jr.
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

**J O H N S E N**, Judge:

¶1        Having remanded two prior placement rulings by the superior court in this dependency matter, we now affirm the court's finding of good cause to deviate from a preferred placement under the Indian Child Welfare Act ("ICWA"), specifically 25 U.S.C. § 1915(a).[1]

**FACTS AND PROCEDURAL BACKGROUND**

¶2        The Department of Child Safety ("DCS") took custody of the child ("Child") in October 2013, when she was 11 months old.  At the same time, DCS also took custody of Child's older half-sister ("Sister").  DCS placed the girls in separate foster homes because of Sister's special needs. DCS notified the Navajo Nation of the proceeding; the court thereafter ruled ICWA did not apply "as the child(ren) do not qualify pursuant to the notification from the Tribe."  Once Child was in placement, Willie and Erin T. ("Foster Parents"), the adult children of the couple with whom Child had been placed, served as "respite" placement, and Child developed a relationship with them.  Anticipating severance of Child's parents' rights, DCS began transitioning Child to Foster Parents' home in early 2015.  Child formally was placed with Foster Parents in December 2015, just after her third birthday.

¶3        Child's mother, meanwhile, gave birth to another child ("Brother") in 2014, and Alexandra K. adopted the infant.  In August 2015, Child's birth parents asked Alexandra to become Child's placement. Alexandra then moved to intervene in this proceeding and asked that she be granted physical custody of Child.  The superior court granted her motion to intervene on December 1, 2015, at the same time it terminated the parental rights of Child's parents.

---

[1]        Absent material revision after the relevant date, we cite the current version of a statute or rule.

¶4 Foster Parents had expressed interest in adopting Child. Before an evidentiary hearing in May 2016 to determine Child's permanent placement, Alexandra helped Child's biological mother enroll in the Navajo Nation, then filed a motion asking the court to find that ICWA applied to Child's placement. At the hearing on May 16, 2016, the court ruled the case was subject to ICWA. The court then heard three days of evidence, after which it concluded it was in Child's best interests to remain with Foster Parents because she had been with them since she was 11 months old and "mov[ing] her from this secure relationship would cause her significant and unnecessary trauma." The court declined to apply ICWA in deciding the placement issue, ruling that "[t]o inject ICWA in this case after parental rights have been terminated is untimely." The court thus denied Alexandra's motion to become Child's adoptive placement.

¶5 Alexandra appealed, and this court vacated the order denying her motion for custody. We ordered that on remand, the superior court must apply ICWA's adoptive placement preferences. The superior court held another evidentiary hearing in August 2017 on Alexandra's motion for change of placement. Child's biological parents testified they preferred that Child be permanently placed with Alexandra. The Navajo Nation's social worker testified the Nation would prefer the court place Child with Alexandra because she was committed to maintaining a relationship with the Navajo culture. The court found that neither Alexandra nor Foster Parents qualified as a preferred placement under 25 U.S.C. § 1915(a). The DCS case manager testified DCS had not located any ICWA-compliant placement and that the Navajo Nation had not suggested any. The superior court denied Alexandra's motion for change of custody, finding that, under the circumstances, there was good cause to deviate from ICWA's placement preferences and affirmed the prior custody and placement orders.

¶6 Alexandra appealed and this court once again vacated the superior court's order. In her reply brief on appeal, Alexandra argued for the first time, and DCS conceded at oral argument, that the superior court erred by failing to apply the terms of an intergovernmental agreement between the State and the Navajo Nation (the "IGA") in determining Child's placement. DCS conceded that, under the IGA, Alexandra was a preferred placement for Child because she was an "adoptive family approved by the N[ation]." We concluded that, in light of the IGA, the record no longer supported the superior court's finding that there was no preferred placement available under ICWA.

¶7 On remand, Alexandra moved for a change of judge for cause; the presiding superior court judge denied the motion. The court also

denied Alexandra's motion for sanctions against DCS and the Attorney General's Office based on their failure to disclose the IGA.

¶8            Alexandra moved to preclude DCS from offering evidence of Child's bond with Foster Parents and of the absence of such a bond between Child and Brother.  She further asked the court to hold DCS in contempt for violating a May 2017 order mandating visits between Child and Brother. The superior court denied both motions.

¶9            The court then heard evidence over two days in November 2018 and January 2019 on whether good cause existed to order that Child be placed with Foster Parents rather than with Alexandra, a preferred placement under ICWA and the IGA.  In an eight-page ruling, the court addressed the factors in 25 C.F.R. § 23.132(c) and also considered other circumstances, which it found together supported good cause to deviate from the ICWA placement preference.  The court accordingly denied Alexandra's motion to be an adoptive placement and ruled that Child should remain permanently with Foster Parents.

¶10           Alexandra timely appealed from the superior court's orders.

## DISCUSSION

### A.    Jurisdiction.

¶11           DCS argues that the superior court's good-cause ruling is not a final appealable order.  *See Jewel C. v. Dep't of Child Safety*, 244 Ariz. 347, 350, ¶ 8 (App. 2018) (order changing placement not a final order for purposes of appeal).  Without deciding that issue, we exercise our discretion to treat Alexandra's appeal as a petition for special action.  *See Danielson v. Evans*, 201 Ariz. 401, 411, ¶ 35 (App. 2001).

¶12           DCS also argues Alexandra lacks standing.  It contends she is not an aggrieved party because no legal authority confers a right to placement on someone who is a preferred placement under ICWA.  But Alexandra is an intervenor who raised the placement issue now presented for review.  We conclude she has sufficient interest in the outcome to appear in this proceeding.

**B.      Good Cause to Deviate from the Placement Preferences.**

**1.      Legal principles.**

**¶13**          We review the interpretation and applicability of ICWA *de novo*. *Michael J., Jr. v. Michael J., Sr.*, 198 Ariz. 154, 156, ¶ 7 (App. 2000). "We review a finding of good cause to deviate from ICWA [placement] preferences for an abuse of discretion." *Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 343, ¶ 14 (App. 2012). We will not reweigh the evidence the superior court heard; nor will we redetermine the credibility of witnesses who testified before that court. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶¶ 18-19 (2018).

**¶14**          In considering adoptive placements for an Indian child under ICWA, "a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a). Although neither Foster Parents nor Alexandra fall into any of those specific categories, it is undisputed that the IGA governs placement preferences applicable to Child and that Alexandra is a preferred placement for Child under the IGA because hers is an "adoptive family approved by the N[ation]." Accordingly, under ICWA, absent "good cause," the superior court was required to grant Alexandra's motion to become Child's adoptive placement.

**¶15**          A regulation issued by the Bureau of Indian Affairs ("BIA") elaborates on the "good cause" requirement under ICWA:

> A court's determination of good cause to depart from the placement preferences must be made on the record or in writing and should be based on one or more of the following considerations:
>
> (1)     The requests of one or both of the Indian child's parents . . .
>
> (2)     The request of the child, if the child is of sufficient age and capacity to understand the decision that is being made;
>
> (3)     The presence of a sibling attachment that can be maintained only through a particular placement;
>
> (4)     The extraordinary physical, mental, or emotional needs of the Indian child, such as specialized treatment

services that may be unavailable in the community where families who meet the placement preferences live;

(5)     The unavailability of a suitable placement after a determination by the court that a diligent search was conducted . . . .

25 C.F.R. § 23.132(c).

¶16     Under 25 C.F.R. § 23.132(b), a party asserting good cause to deviate from the placement preferences bears the burden of proof by clear and convincing evidence. *See Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 536, ¶ 19 (App. 2015). Further, the rule cautions that a good-cause determination may not be "based solely on ordinary bonding or attachment that flowed from time spent in a non-preferred placement that was made in violation of ICWA." 25 C.F.R. § 23.321(e).

¶17     In 2016, the BIA issued revised Guidelines for Implementing the Indian Child Welfare Act ("Guidelines"), which the agency described as a "reference and resource for all parties involved in child custody proceedings involving Indian children." Guidelines at 4. Guidelines issued by the BIA are persuasive authority when it comes to interpreting ICWA and related rules. *Gila River Indian Cmty.*, 238 Ariz. at 535, ¶ 16.

### 2.     The superior court's findings.

¶18     In finding good cause to deviate from an ICWA preferred placement, the superior court made the following findings and conclusions:

On October 10, 2018, the Navajo Nation requested in writing to place Child with [Alexandra] in accordance with the IGA.

*          *          *

Neither [Foster Parents] nor [Alexandra] are Native American. However, pursuant to the 2014 IGA, [Alexandra] has ICWA adoptive placement preference.

*          *          *

Applying [25] C.F.R. § 23.132(c), (1) Child's biological parents request Child be placed with [Alexandra]; (2) While Child expresses her desire to stay with [Foster Parents], she is six-years-old and there is no evidence to show she is of sufficient age and capacity to understand the decision that is being

made; (3) Child has no sibling attachment with [Alexandra's] adopted son [Brother]. Child was attached to her sibling [Sister] at the time the dependency case began . . . [Foster Parents] have previously tried to maintain a relationship with Child and [Sister] . . . (4) Child has no extraordinary physical, mental, or emotional needs; and (5) [Alexandra] is the preferred ICWA placement.

¶19 The court then turned to Guideline H.4. That provision explains that while 25 C.F.R. § 23.132(c) "identifies specific factors that should provide the basis for a finding of good cause to deviate from the placement preferences," that list of enumerated factors "is not exhaustive." Guidelines at 61. Relying on that provision, the superior court found that the following factors constituted "extraordinary circumstances" establishing good cause to deviate from ICWA's placement preferences:

Child has been in foster care since October 29, 2013.

[Alexandra] has no relationship with Child.

[Alexandra's] adopted son [Brother] (and Child's sibling) has no sibling relationship with Child.

Child was not subject to ICWA until May 16, 2016. Parental rights had been terminated months before.

From October 2013 to May 16, 2016, Child formed attachments and bonds with [Foster Parents] and [Foster Parents'] family.

¶20 Elaborating, the court acknowledged that, under ICWA, Alexandra was "the placement inherently in Child's best interest," and that Alexandra had shown she was willing to raise Child "connected to [Child's] Navajo heritage." But the court found these facts were outweighed by the fact that neither Alexandra nor Brother, her adopted son, had a relationship with Child and that over the prior five and a half years, Child "established strong bonds" with Foster Parents and their family. Further, the court found, Foster Parents "have provided Child a safe and loving home" and "have made efforts to expose" Child to her Native heritage and stated they will continue to do so. The court noted experts had offered conflicting opinions about whether separating Child from Foster Parents would cause the child "significant trauma." The court expressly stated it disagreed with the opinion of Alexandra's expert and agreed with the expert called by DCS,

who testified in 2016 that Child would incur "significant trauma and damage" if she were removed from Foster Parents. The court concluded:

> An additional three bonding years have passed since that assessment. Uprooting Child from the home would cause significant trauma to Child. Therefore, it is in Child's best interests to remain in the [Foster Parents'] home.

### 3. The good-cause finding was not an abuse of discretion.

**¶21** ICWA and the associated BIA rule required the superior court to consider the placement preferences established by law, along with the placement preference of the Nation and of Child's parents, and the superior court did so here. *See* 25 U.S.C. § 1915(a), (c); 25 C.F.R. § 23.132(c); Guidelines, H.1, at 57. Alexandra argues, however, that the court erred by relying on the Guidelines to base its good-cause determination on factors other than those listed in the statute and rule.

**¶22** At the outset, we reject Alexandra's contention that because the Guidelines are not binding, they offer no support for the superior court's decision. Recognizing the Guidelines are not binding, our supreme court has held courts nevertheless may look "to them for assistance in interpreting and applying the provisions of ICWA." *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 572, ¶ 24 (2008); *see Gila River Indian Cmty.*, 238 Ariz. at 535, ¶ 16; *Navajo Nation*, 230 Ariz. at 345, ¶ 19 (citing Guidelines in appeal from finding of good cause to deviate from placement preference).

**¶23** Contrary to Alexandra's argument, a state court need not find one of the factors identified in 25 C.F.R. § 23.132(c) before it may conclude that there is good cause to deviate from a preferred placement. The regulation states that a good-cause finding "should" be based on one of the stated factors, but it does not require it. Indeed, the BIA stated in its prefatory material to the final rule that

> there may be extraordinary circumstances where there is good cause to deviate from the placement preferences based on some reason outside of the five specifically-listed factors. Thus, the final rule says that good cause "should" be based on one of the five factors, but leaves open the possibility that a court may determine, given the particular facts of an individual case, that there is good cause to deviate from the placement preferences because of some other reason.

Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,777, 38,839 (June 14, 2016).

¶24        The Guidelines likewise make clear that the factors enumerated in the statute and the rule are not the only matters the court may credit in deciding whether to deviate from a placement preference:

> **Factors that may form the basis for good cause.**  The rule's list of [factors] is not exhaustive.  The State court has the ultimate authority to consider evidence provided by the parties and make its own judgment as to whether the moving party has met the statutory "good cause" standard.  In this way, the rule recognizes that there may be extraordinary circumstances where there is good cause to deviate from the placement preferences based on some reason outside of the five specifically-listed factors.  The rule thereby retains discretion for courts and agencies to consider any unique needs of a particular Indian child in making a good cause determination.

Guidelines, H.4, at 61.

¶25        Here, the superior court's ruling was based, in part, on its finding that a change in custody would cause Child "significant trauma and damage."  As an initial matter, we will not upset the court's acceptance of one expert witness's opinion over the other on the question of whether Child will suffer trauma if she is removed from Foster Parents.  *See Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).  Alexandra's expert witness did not testify that Child would suffer no harm if she were compelled to transition from Foster Parents, but testified only that there was a high probability that the transition could be made over a period of months in a manner that could "reduce that damage" and would not be traumatic.

¶26        Nevertheless, Alexandra argues the court erred by relying on the opinion of Suzanne M. Schunk, the witness called by DCS.  Schunk is a licensed clinical social worker, and Alexandra points out she is neither a psychologist nor an expert on bonding issues.  But Schunk testified about her experience in issues concerning the welfare of children within families, and the weight to be given her opinion was a matter for the superior court to determine.

¶27        Child had three supervised visits with Alexandra and Brother in early 2016.  Child's Foster Father testified that after each of the three

visits, Child acted out and experienced night terrors, in which she would awake screaming and would be "almost inconsolable." He also reported Child pulled back in fear when she spotted a transit vehicle of the same sort that had taken her to the visits. Schunk testified based on that information and her interviews with the parties that changing Child's placement would cause Child "a great deal of grief and loss," confuse her sense of identity, and cause "very serious trauma."

¶28     According to Schunk, transferring Child from Foster Parents to Alexandra might cause a physiological change in the child's brain that would impair her immune system. Longer term, there was a risk of academic and social problems, including reactive attachment disorder, that might continue into adulthood. Schunk's report further summarized her conclusions:

> It is the opinion of this clinician that there is insufficient reason to disrupt [Child's] current positive relationships and subject her . . . once again to experiencing grief, loss, fear, confusion – trauma. The more placements and losses a child experiences, the more difficult it becomes for the child to heal and thrive. It is cruel and unnecessary to deliberately subject this child to such trauma, even with the best of services available afterwards. There are no guarantees that she will be able to fully recover and develop the same level of secure relationship with [Alexandra] and [Brother] that she already has with [Foster Parents] and her siblings [Sister] and [Foster Parent's daughter]. Even should that happen, she will have lost valuable time during her childhood recovering from this trauma.

¶29     The superior court did not abuse its discretion in crediting Schunk's opinion that transferring Child from Foster Parents might cause her severe trauma. And a bond between a child and an existing placement and the associated risk of harm to the child from a transfer of placement "are relevant factors in finding good cause to deviate from ICWA placement preferences." *Navajo Nation*, 230 Ariz. at 347, ¶ 30.

¶30     Alexandra, however, argues the court's reliance on Schunk's opinion violated 25 C.F.R. § 23.132(e), which bars courts from finding good cause "based solely on ordinary bonding or attachment that flowed from time spent" with a placement made in violation of ICWA. *See* 25 C.F.R. § 23.132(e). On this basis, Alexandra moved *in limine* before the most recent evidentiary hearing to preclude DCS from relying on evidence of the bond

between Child and Foster Parents to show good cause. In approving Foster Parents as a permanent placement for Child, the court denied Alexandra's motion.

¶31        As to 25 C.F.R. § 23.132(e), the Guidelines state:

> **Ordinary bonding with a non-preferred placement that flowed from time spent in a non-preferred placement that was made in violation of ICWA.** If a child has been placed in a non-preferred placement in violation of ICWA and the rule, the court should not base a good-cause determination solely on the fact that the child has bonded with that placement.
>
> A placement is "made in violation of ICWA" if the placement was based on a failure to comply with specific statutory or regulatory mandates. The determination of whether there was a violation of ICWA will be fact-specific and tied to the requirements of the statute and this rule. For example, failure to provide the required notice to the Indian child's Tribe for a year, despite the Tribe having been identified earlier in the proceeding, would be a violation of ICWA. By comparison, placing a child in a non-preferred placement would not be a violation of ICWA if the State agency and court followed the statute and applicable rules in making the placement, including by properly determining that there was good cause to deviate from the placement preferences.
>
> As a best practice, in all cases, State agencies and courts should carefully consider whether the fact that an Indian child has developed a relationship with a non-preferred placement outweighs the long-term benefits to a child that can arise from maintaining connections to family and the Tribal community.

Guidelines, H.5, at 63.

¶32        Here, the superior court acted within its discretion under the rule by considering the bond that Child formed with Foster Parents during the time from her initial removal in October 2013 until it was determined that she was an Indian child in May 2016. Under the Guidelines, we examine the facts of the matter and apply the requirements of the statute and the rule to those facts. Unlike in the situation posited by the Guidelines,

there is no suggestion here that DCS or the court failed to give the requisite notice to the Nation at the outset of the case. Put simply, because ICWA did not apply to Child's case until May 2016, her placement with Foster Parents was not "in violation of ICWA" before then, *id.* (quoting 25 C.F.R. § 23.132(e)), and the court did not err under the rule by considering the bond that had formed (and flourished) before that date. Moreover, in finding that a change of placement would cause Child significant trauma, the superior court cited the testimony of Schunk, whose opinion was based on the bond that existed between Foster Parents and Child as of May 2016, before the case became subject to ICWA. Further, as DCS argues, neither 25 U.S.C. § 1915 nor 25 C.F.R. § 23.132 prevented the court from considering the implications of Child's continued placement with Foster Parents after May 2016 as long as those implications were not the sole basis for the court's finding of good cause. Indeed, "[t]he conclusion that a strong emotional bond is trumped by ICWA . . . is contrary to law." *Navajo Nation*, 230 Ariz. at 347, ¶ 29.

¶33        Alexandra insists, however, that the court erred by weighing the effects of Child's extended stay in foster care against a change in placement because the court's own failures, and those of DCS and the Attorney General's Office, were the reason Child had been deprived of permanency for so long. According to Alexandra, if this court were to affirm the ruling under review, we would grant license to DCS, the Attorney General's Office and the court to "ignore the law."

¶34        It is undisputed, however, that neither Child's biological mother nor the Nation asserted before May 2016 that Child was an Indian child. Even after that date, Alexandra, by then an intervenor, did not immediately contend she was a preferred placement under applicable law. Her preferred status was recognized only after the parties and the court focused on the provisions of the IGA, which grants preferred-placement status to "[o]ther adoptive family approved by the N[ation]." As discussed *infra* ¶¶ 41-42, in denying Alexandra's subsequent motion for sanctions against DCS and the Attorney General's Office, the superior court found that the individuals involved at those agencies simply overlooked the relevant provision in the IGA and were unaware of its significance to Alexandra's motion for placement. Given the superior court's rejection of Alexandra's allegations that the government acted in bad faith with respect to the IGA, we will not upset the court's placement ruling on this basis.

¶35        Nor, contrary to Alexandra's contention, did the superior court err by relying in part on the absence of any current sibling relationship between Child and Brother, Alexandra's adopted son. Alexandra filed a

motion *in limine* before the most recent evidentiary hearing arguing that DCS should be estopped – by its failure to arrange visits between the two children – from arguing the two had no bond. Alexandra also moved to have DCS held in contempt for its alleged breach of an order requiring visits between the two siblings.

**¶36** Alexandra's motions were premised on the court's May 2017 order that "visitation shall take place between siblings." In October 2017, Alexandra moved to compel visits, asserting that although an unspecified number of "visits" had gone well, Foster Parents balked at arranging additional visits, so no more had taken place. On the day Alexandra filed that motion, however, the superior court issued its order finding good cause to continue placement with Foster Parents, so it denied the motion to compel additional visits. In connection with the most recent evidentiary hearing, the court denied Alexandra's estoppel and contempt motions, ruling that she had not shown that DCS violated the visitation order, which, the court noted, did not contain any specifics about how many visits were supposed to take place or how frequently they were to occur.

**¶37** Ruling on the merits of Alexandra's pretrial motions, the superior court heard evidence concerning the circumstances of the parties' respective efforts to arrange visits and did not abuse its discretion in denying Alexandra's motions. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). As for the relevance of the absence of sibling visits to the superior court's ultimate placement ruling, after this court vacated the previous placement order in May 2018, Alexandra did not raise the visit issue again until the evidentiary hearing on remand in November 2018.

**¶38** Alexandra further argues she demonstrated she is more committed than Foster Parents to raising Child to be familiar with her extended family and with Navajo culture. The superior court recognized that Alexandra was committed to raising Child "connected to her Navajo heritage." But the court also heard evidence Foster Parents have purchased books about Native American culture and asked a Navajo Nation representative about resources or events that might help Child maintain her cultural ties to the Nation. Five of Foster Mother's adopted siblings are Native Americans, and Schunk testified Foster Parents' extended family members have "consistently exposed them to as much Native American culture as they can" and have taken them to "many powwows," and that Foster Parents had told her they are interested in continuing "to do anything they could to further that culture."

13

¶39 Under the circumstances, the superior court did not err by declining to order a placement that, even by Alexandra's account, could not be made permanent for some indeterminate period of time due to the gradual transition that a change in placement would require. "While ICWA and [the regulation] provide objective standards, . . . judges may appropriately consider the particular circumstances of individual children and protect the best interests of those children as envisioned by Congress." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,797.

## C. Denial of Motion for Change of Judge for Cause.

¶40 Alexandra also challenges the order by the superior court presiding judge denying her motion for change of judge for cause pursuant to A.R.S. § 12-409 (2019) and Arizona Rule of Procedure for the Juvenile Court 2(A)(1) (allowing "change of judge if a fair and impartial hearing cannot be had by reason of the interest or prejudice of the assigned judge"). Alexandra acknowledges that judicial rulings almost never prove bias sufficient to support a change of judge, but she does not contend she offered any other evidence to support her contention that the superior court judge was biased against her. *See State v. Granados*, 235 Ariz. 321, 326, ¶ 14 (App. 2014); *Stagecoach Trails HMC, L.L.C. v. City of Benson*, 232 Ariz. 562, 568, ¶ 21 (App. 2013) ("Judicial rulings alone do not support a finding of bias or partiality without a showing of an extrajudicial source of bias or a deep-seated favoritism."); *Smith v. Smith*, 115 Ariz. 299, 303 (App. 1977). Alexandra seems to argue that that legal principle violates her due-process right, but offers no legal authority in support.

## D. Denial of Motion for Sanctions.

¶41 As noted, Alexandra moved for sanctions against DCS and the Attorney General's Office based on their failure to disclose the IGA; the court denied the motion on February 1, 2019. In opposing the motion, DCS argued that Alexandra questioned a witness from the Nation about the IGA during the August 2017 evidentiary hearing but did not raise the issue of the IGA until her reply brief in the second appeal, and did not ask DCS for a copy of it. In denying Alexandra's motion, the superior court ruled the IGA is a public record but concluded that DCS and the Attorney General's Office "mistakenly did not assess the applicability of the IGA to the case." The court accordingly ruled Alexandra had not shown that DCS or the Attorney General's Office intentionally or knowingly withheld the IGA from Alexandra or the court.

**¶42** The court did not abuse its discretion in denying the motion for sanctions. Although, as the court concluded, DCS should have disclosed the IGA under Arizona Rule of Procedure for the Juvenile Court 44, Alexandra points to no record evidence for the proposition that DCS or the Attorney General's Office deliberately concealed the existence of the document or otherwise committed a fraud on the court. For the same reason, Alexandra has not shown lawyers with DCS or the Attorney General's Office committed an ethical violation under Arizona Supreme Court Rule 42, Rules of Professional Conduct, ERs 3.3 or 3.4.

## CONCLUSION

**¶43** For the reasons stated, we accept jurisdiction of the appeal as a petition for special action. Because we conclude the superior court did not err, we deny relief.



AMY M. WOOD • Clerk of the Court
FILED: AA